**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

MASSEY, INC., *et al.*,                          :
                                                 :
    Plaintiffs,                     :
                                                 :
v.                                               :    CIVIL ACTION NO.
                                                 :    1:07-CV-741-RWS
MOE'S SOUTHWEST GRILL, LLC,                       :
*et al.*,                                        :
    Defendants.                     :
                                                 :
                                                 :

## <u>ORDER</u>

This case comes before the Court on: Defendants' Motion for Summary

Judgment as to Moe's Bros., LLC [175], Plaintiff Moe's Bros., LLC's Motion

to Reinsert Moe's Brother's Ventures Inc. In Lieu of Nominal Plaintiff Moe's

Bros., LLC [196], Defendant Moe's Southwest Grill, LLC's Motion for

Summary Judgment as to Counts I-III [199], Defendant Moe's Southwest Grill,

LLC's Motion for Summary Judgment as to Pre-August 28, 2002 UFOC

Recipients [200], Defendants Moe's Southwest Grill, LLC, Moe's Southwest

Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin

Sprock, III's Motion for Summary Judgment as to Edward Tronnes [203],

Defendants Moe's Southwest Grill, LLC, Moe's Southwest Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin Sprock, III's Motion for Summary Judgment as to IIED [208], Defendants Moe's Southwest Grill, LLC, Moe's Southwest Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin Sprock, III's Motion for Summary Judgment as to All Claims for Damages, and in the Alternative, Partial Summary Judgment as to Fraud and Georgia RICO Claims [209], and Plaintiffs' Motion for Partial Summary Judgment as to Counts II & III [210]. After a review of the record, the Court enters the following Order.

## I. Factual Summary

In July 2000, Moe's Southwest Grill, LLC ("Moe's") was formed as a fast-casual Mexican-food restaurant-franchise that began marketing itself to potential franchisees in January 2001. Def.'s SMF, Dkt. No. [209-2] at ¶¶ 1, 4. From 2001 to 2007, Moe's franchised the "Moe's Southwest Grill" restaurants, growing from 17 restaurants at the end of 2001 to 343 restaurants at the end of 2006. Id. at ¶ 2. At all times relevant to this order, Martin Sprock was the Chief Executive Officer of Moe's. Id. at ¶ 3.

A. LaGratta and CRM Agreement

In 1996, Tony LaGratta worked for Chain Reaction Marketing ("CRM"),

a third-party distributor which specialized in brokering food-supply and

distribution services. Id. at ¶ 6. But by 2001, LaGratta was the paid employee of

another Sprock-owned concept, Planet Smoothie, where he served as the food-

supply and distribution-services manager. Id. at ¶ 9.

In March 2001, LaGratta contacted Steven Salzburg, the owner of CRM,

to discuss having CRM serve as the food distributor for Moe's. Id. at ¶ 7. In

May of that year, Salzburg agreed to help LaGratta to create and run Moe's

food-supply chain and distribution network. Id. at ¶ 12. Salzburg has testified

that CRM only agreed to serve in this capacity due to Salzburg's prior

relationship with LaGratta, and that were it not for that relationship, CRM

would not have assisted Moe's because its 2001 purchasing volume was below

CRM's standard base-level purchasing requirement. Salzburg Dep., Dkt. No.

[279-1] at 186:20-187:10. At that time, LaGratta and CRM also identified

International Jobbers ("IJ") as the primary distributor for particular regions,

including North Georgia. Dkt. No. [209-2] at ¶ 15; Dkt. No. [243-1] at ¶ 8. As

the distributor, IJ received orders from franchisees in lieu of the franchisees

contacting individual suppliers and coordinating a delivery schedule for each source. Dkt. No. [209-2] at ¶ 17.

In 2001, CRM and IJ agreed that IJ would pay CRM a brokerage commission in the amount of 2% of the Moe's franchisees' purchases made through IJ. Id. at ¶ 18.  In order to fund that fee, IJ charged the franchisees a "margin on sell" percentage of 10.5% instead of 8.5%. Dkt. No. [243-1] at ¶¶ 15-16. Additionally, CRM agreed to pay LaGratta half of whatever funds it received from any of Moe's food suppliers and distributors, including IJ. Dkt. No. [209-2] at ¶ 19. It was understood from the beginning that LaGratta would serve as the principal day-to-day manager of the Moe's account for CRM. Id. at ¶ 20. And CRM's role in the process was to "negotiate the overall distribution program, leverage purchasing, and utilize CRM's proprietary systems to manage the distributors providing products to the Moe's system." Id. at ¶ 21. Martin Sprock knew about the CRM-LaGratta relationship and approved of it. Id. at ¶ 22.

It is undisputed that LaGratta formally created the entity SOS Foodservice Consultants, LLC ("SOS") on August 28, 2002 to house the CRM-LaGratta agreement. Dkt. No. [209-2] at ¶ 23. However, it is disputed whether

4

there was a precursor entity to SOS–SOS Foodservice Incorporated, and it is disputed when LaGratta agreed to pay Sprock 50% of LaGratta's profits after expenses. Id. at ¶¶ 23-25; Dkt. No. [243-1] at ¶¶ 23-25. Defendants maintain that Sprock did not have a financial interest in SOS until after August 28, 2002, or after SOS was formed, because LaGratta did not agree to pay Sprock half of SOS's profits until "some later point in the second half of 2002." Dkt. No. [209-2] at ¶ 25. However, Plaintiffs cite LaGratta's own testimony in which he states that his agreement with Sprock was formed "after the first two Moe's were opened" which would have been in 2001–before SOS was formally created. Dkt. No. [243-1] at ¶ 25.

On August 24, 2004, SOS executed an Operating Agreement which listed Sprock and LaGratta as members of SOS and stated that the members would shares equally any profits above any expenses, which included a $150,000 salary to LaGratta. Ex. C, Dkt. No. [209-5] at 13. On August 25, 2004, Sprock received his first distribution from SOS. Dkt. No. [209-2] at ¶ 32. However, CRM did not know that Sprock held an equity stake in SOS until "several years" after its original agreement with LaGratta. Def.'s SMF, Dkt. No. [209-2] at ¶ 27. And after learning of Sprock's stake, CRM did not change the

way it operated its distribution system for Moe's. Id. at ¶ 28. But after the

Operating Agreement was signed, the fees charged by CRM–which were shared

with SOS–dropped from 2% to 1%. Id. at 42.

Sprock has testified that he was unaware of any food brokerage company

other than SOS which was approved for franchisee purchases. Dkt. No. [243-1]

at ¶ 29. As well, LaGratta and Sprock testified that CRM was capable of

managing all aspects of the supply chain without SOS, and Salzburg stated that

Sprock provided no services to the supply chain. Id. at ¶¶ 33-35.

It "never crossed" Sprock's mind that it would be improper to take any

financial interest in SOS. Id. at ¶ 51. When Sprock learned that SOS was

sending him a check in 2004, Sprock has testified that he called his attorney to

make sure it was acceptable for him to take the funds. Id. at ¶ 54.

B. UFOC

As required by the Federal Trade Commission ("FTC"), each prospective

franchisee received a Uniform Franchise Offering Circular ("UFOC") prior to

joining the franchise, which "described in detail the Moe's franchise system,

including but not limited to information regarding Moe's, its predecessors and

affiliates, the franchise's business experience, all ongoing litigation, the

investment and financing requirements of franchisees, and both franchisor and franchisee's ongoing obligations." Id. at ¶ 29. It is undisputed that the 2001, 2002, and 2003 UFOCs did not identify SOS as an affiliate, nor did they disclose that Sprock had an equity stake in SOS. Id. at ¶ 30; Dkt. No. [250] at ¶ 2.

In each of the 2001, 2002, and 2003 UFOCs, Defendants made the following statements in Item 8: Restrictions on Sources of Products and Services:

> You are obligated to operate the restaurant according to our systems standards. System standards may regulate, among other things, the types, models and brands of required fixtures, furnishings, equipment, signs, materials and supplies to be used in operating the restaurant, requires or authorized products and product categories and designated or approved - suppliers of such items (which may be limited to or include us or our affiliates). You must purchase certain paper products including, among other things, plates, cups, boxes and containers bearing the "MOE'S SOUTHWEST GRILL" name or other trade names or service marks through certain designated suppliers who are authorized to manufacture these products. You must purchase certain hardware and software for the operation of MOE'S SOUTHWEST GRILL restaurant. Those suppliers are not affiliated with us. **Neither we nor any of our affiliates will derive any income from these purchases**.
>  . . .
> We do not negotiate purchase arrangements with suppliers for the benefit of franchisees. Due to the volume of purchases made from suppliers by the Company and its franchisees, certain

> suppliers provide discounts to the Company and its franchisees.
> The Company does not negotiate for these discounts and does not
> monitor the amount of any discounts to franchisees.

Dkt. No. [209-3] at 13-14 (emphasis added).

In 2004, Moe's disclosed SOS in Item 8 for the first time, stating: SOS "provides food brokerage services to Moe's franchisees. Franchisees are able to use SOS on a voluntary basis. We do not derive revenue, directly or indirectly, from SOS in connection with the services SOS provides to our franchisees. H. Martin Sprock, III, our Manager, Chief Executive Officer and President, is **projected** to become a minority equity holder in SOS during fiscal year 2004." Ex. M, Dkt. No. [209-15] at 5 (emphasis added).

## II. Discussion

### A. Motion for Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue

of material fact.'"  Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259

(11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)

(internal quotations omitted)).  Where the moving party makes such a showing,

the burden shifts to the non-movant, who must go beyond the pleadings and

present affirmative evidence to show that a genuine issue of material fact does

exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257  (1986).

The applicable substantive law identifies which facts are material.  Id. at

248.  A fact is not material if a dispute over that fact will not affect the outcome

of the suit under the governing law.  Id.  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict for the non-moving party.

Id. at 249-50.

In resolving a motion for summary judgment, the court must view all

evidence and draw all reasonable inferences in the light most favorable to the

non-moving party.  Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th

Cir. 2002).  But, the court is bound only to draw those inferences which are

reasonable.  "Where the record taken as a whole could not lead a rational trier

of fact to find for the non-moving party, there is no genuine issue for trial."

AO 72A
(Rev.8/82)

Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"If the evidence is merely colorable, or is not significantly probative, summary

judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations

omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met

its burden under Rule 56(c), the nonmoving party "must do more than simply

show there is some metaphysical doubt as to the material facts").

Finally, the filing of cross-motions for summary judgment does not give

rise to any presumption that no genuine issues of material fact exist.  Rather,

"[c]ross-motions must be considered separately, as each movant bears the

burden of establishing that no genuine issue of material fact exists and that it is

entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser

Eng'rs, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004).

### B. Motion to Amend and Motion for Summary Judgment as to Moe's Bros., LLC

On May 5, 2011, the Defendants moved for summary judgment against

Plaintiff Moe's Bros., LLC, arguing that because Moe's Bros., LLC was

administratively dissolved on July 9, 2005, Moe's Bros., LLC does not have

standing to pursue any legal claims against the Defendants. Def.'s MSJ, Dkt.

10

No. [175-1] at 4-7. In response, Plaintiff Moe's Bros., LLC does not challenge

Defendants' standing argument against Moe's Bros., LLC and has instead filed

a Motion to Amend under its sister company, Moe's Brothers Ventures, Inc.

("MBVI"). See Pl.'s Opp., Dkt. No. [193] at 6-7 (arguing that MBVI would

have standing and not addressing Moe's Bros., LLC's standing deficiency).

MBVI requests that this Court reinstate it as the real party in interest for

the Northridge Moe's location in Moe's Bros., LLC's stead. Pl.'s Opp., Dkt.

No. [193]; Pl.'s MTA, Dkt. No. [196-1]. MBVI was the original Plaintiff in this

suit but Moe's Bros., LLC was substituted for MBVI during the litigation as

Moe's Bros., LLC's name is handwritten on the original Market Development

Agreement and Moe's Bros., LLC was the "only entity name appearing

anywhere on the franchise documents available to all the parties." Pl.'s MTA,

Dkt. No. [196-1] at 2. However, as the Northridge Plaintiff notes, "there is no

dispute in the present case that Moe's Borthers Venture, Inc., the original

Plaintiff in this action, was and had been both the franchisee of Moe's

Southwest Grill, LLC for the 'Northridge' Moe's restaurant as well as the

proper Plaintiff and real party in interest in this action since the inception of the

lawsuit." Id. at 7. And it appears that the "new information" which lead to this

11

requested substitution was obtained from Moe's Bros., LLC's own 30(b)(6)

witness, Cash Hilmer, the majority shareholder of both Moe's Bros., LLC and

MBVI. Id. at 2.

When a motion to amend is filed after a scheduling order deadline,

Federal Rule of Civil Procedure 16 is the proper guide for determining whether

a party's delay may be excused. S. Grouts & Mortars, Inc. v. 3M Co., 575 F.3d

1235, 1241(11th Cir. 2009) (citing Sosa v. Airprint Sys., 133 F.3d 1417, 1418

n.2 (11th Cir. 1998)).  A scheduling order may be modified only for good cause

and with the Court's consent. FED. R. CIV. P. 16(b)(4).  The key to good cause

is diligence.  Sosa, 133 F.3d at 1419.

The Eleventh Circuit has found three factors which warrant consideration

when evaluating diligence:  "(1) [whether] the [party seeking amendment]

failed to ascertain facts prior to filing the [pleading] and to acquire information

during the discovery period; (2) [whether] the information supporting the

proposed amendment was available to the [party seeking amendment]; and (3)

even after acquiring information, [whether] the [party seeking amendment was]

delayed in asking for amendment." Auto-Owners Ins. Co. v. Ace Elec. Serv.,

Inc., 648 F. Supp. 2d 1371, 1375 (M.D. Fla. 2009) (citations omitted).

Additionally, if Defendants survive the Rule 16(b)(4) challenge, they still must satisfy Federal Rule of Civil Procedure 15.  Rule 15 directs the Court to "freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2).  Despite an instruction that leave should be freely given when justice so requires, leave to amend is "by no means automatic."  Layfield v. Bill Heard Chevrolet Co., 607 F.2d 1097, 1099 (5th Cir. 1979).[1]  The trial court has "extensive discretion" in deciding whether to grant leave to amend.  Campbell v. Emory Clinic, 166 F.3d 1157, 1162 (11th Cir. 1999).  A trial court may choose not to allow a party to amend "when the amendment would prejudice the [other party], follows undue delays or is futile."  Id.

Here, the scheduling order set the joinder of parties and amendment of pleadings deadline as March 1, 2010. Dkt. No. [117] at 1. On March 16, 2011, Cash Hilmer was deposed and the relevant information was brought to the surface. However, Plaintiff did not move to amend until June 13, 2011, after the Defendants filed a motion for summary judgment on that issue. As a result, the Court does not find good cause.

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the court adopted as binding precedent all decisions of the former Fifth Circuit decided before October 1, 1981.

13

It is worth noting that the Plaintiff did not cite Rule 16 in its Motion to Amend brief and did not respond to the Defendants' good cause arguments as a reply was not filed. Thus, Defendants' Rule 16 arguments are deemed **UNOPPOSED**. LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion."). But even if they were not deemed unopposed, the Court does not find that Plaintiff was diligent in this matter. Plaintiff substituted a defunct company without doing research to determine if that entity would have standing. As well, all of these facts were in the Plaintiff's control as it was the Plaintiff's 30(b)(6) witness who testified regarding this matter. Moreover, a simple search of the Secretary of State's website would have revealed this failure. Plaintiff turned a blind eye to its own legal standing and cannot be found diligent in doing the same. Therefore, Plaintiff's Motion to Amend [196] is **DENIED**.[2]

As well, because Moe's Bros., LLC did not respond to Defendants' arguments that it does not have standing to sue as a defect legal entity, Defendants' standing argument is deemed **UNOPPOSED**. LR 7.1(B), NDGa

---

[2]Because the Court finds that Plaintiff cannot satisfy the threshold requirement of Rule 16, the Court declines to decide whether it would also survive Rule 15. However, the Court has grave reservations about whether MBVI as another defunct entity would also have standing to sue the Defendants.

AO 72A
(Rev.8/82)

("Failure to file a response shall indicate that there is no opposition to the motion."). Therefore, Defendants' Motion for Summary Judgment as to Moe's Bros., LLC [175] is **GRANTED**. Moe's Bros., LLC is **DISMISSED** from this action.

### C. Defendants' Contractual Limitations Summary Judgment Motion

Defendants[3] next move for summary judgment against Plaintiffs 3M Restaurants, CCM Restaurants, LLC, Gryphmore Foodservices of Kentucky, Inc., Neil Griffeth, JFM Restaurants, LLC, The Jimmy Legs Group, LLC, Moe's Brunswick, LLC, John McKeown, Rounding Third, LLC, SMI Restaurants, LLC, David Titshaw, and Taylor Investment Partners, II, LLC on the basis that Counts I-III are barred by a contractual-limitations period. The above-mentioned Plaintiffs admit that they each signed Market Development and Franchise Agreements with Moe's, and they admit that each franchise agreement contained the following contractual-limitations term:

---

[3]Plaintiffs assert that Martin Sprock cannot take under this contractual limitations provision as he was not a party to the agreement. However, Plaintiffs have admitted *in judicio* that "any individuality and separateness between the Defendants do not exist" and that they are "alter egos" of each other. 2d. Am. Cmpl., Dkt. No. [91-1] at ¶ 43. Thus, the Court finds that this argument is foreclosed by their admission.

15

31. Governing Law and Enforcement

. . .

Any and all claims and actions arising out of or relating to this Agreement, the relationship between Franchisee and MOE'S, or the operation of the Franchised Business brought by any party to this Agreement against another party to this Agreement, shall be commenced within one (1) year from the discovery of the facts giving rise to any such claim or action, or such claim or action shall be barred[.]

Dkt No. [199-2] at ¶¶ 10-11; Dkt No. [216] at ¶¶ 10-11.

In April 2005, Moe's began distributing its 2005 Uniform Franchise Offering Circular ("UFOC") which contained the following statements:

8. **RESTRICTIONS ON SOURCES OF PRODUCTS AND SERVICES**

 . . .

One of our approved suppliers, Systems Opportunities Savings ("SOS") provides food brokerage services to MOE'S franchisees. SOS is indirectly related to us through Martin Sprock, our Chief Executive Officer and President, who is a 50% equity holder in SOS. Individually, Mr. Sprock also holds a small minority interest in two other suppliers in our system: Atlanta Lighting and Kudzu International. We do not derive revenue, directly or indirectly, from any of these suppliers in connection with the services or products they provide to our franchisees.

Dkt. No. [199-2] at ¶ 14.

Independently, in November 2005, the Plaintiffs were verbally made aware that Martin Sprock had an equity stake in SOS in an FAC meeting. Dkt.

16

No. [199-2] at ¶¶ 27-28; Dkt No. [216] at ¶¶ 27-28. As well, relevant to this motion, the parties agreed on August 16, 2006 that the Defendants would waive the contractual limitations period as to any Plaintiffs whose claims had not accrued prior to August 16, 2006. Dkt. No. [214-3].

Because when each Plaintiff received the UFOC is dispositive on this issue, the Court will separate the Plaintiffs into groups which are factually similar.

> **1. Plaintiffs 3M Restaurants, LLC, The Jimmy Legs Group, LLC, John McKeown, Moe's Brunswick, LLC, Rounding Third, LLC, David Titshaw, and Taylor Investment Partners, II, LLC**

Defendants argue that these Plaintiffs are expressly barred by the contractual limitations period. All of these Plaintiffs received a copy of the 2005 UFOC before August 16, 2005, Dkt. No. [216] at ¶¶ 15, 17-20, and none filed suit before March 30, 2007. Id. at ¶ 21. However, the Plaintiffs argue that they should not be barred by the contractual-limitations period because they did not have actual notice that Sprock held an SOS equity stake until November 2005, and that knowing that Sprock held an ownership percentage and knowing that he was receiving a kickback are unique premises.

17

First, the Court finds that the Plaintiffs had knowledge that Sprock held an ownership percentage in SOS before August 15, 2005, and thus the Plaintiffs had inquiry notice of the kickback. Plaintiffs argue that they did not have a legal duty to read the 2005 UFOC and should not be charged with knowledge of any information contained in the document. However, as an initial matter, the Plaintiffs do not point this Court to any legal authority which supports the proposition that Plaintiffs can only be charged with notice of a document that they had a legal duty to read, even when the relevant information was clearly within their possession and found within the document.

Defendants, however, point to persuasive authority that a duty to read is not the relevant inquiry; rather, due diligence is. Defendants argue that securities law cases are persuasive in this matter as the federal securities fraud statute of limitations provision is similarly worded to the contractual provision at issue here. Compare 28 U.S.C. § 1658(b) (stating that the statute of limitations will accrue "2 years after the discovery of the facts constituting the violation") with Dkt. No. [199-2] at ¶ 11 (stating that the actions "shall be commenced within one (1) year from the discovery of the facts giving rise to

any such claim or action"). And, they argue that shareholders are in a similar position to franchisees.

In the §10(b) and Rule 10b-5 context, the Supreme Court has construed the "discovery of the facts" limitation to "refer[] not only to a plaintiff's *actual* discovery of certain facts, but also to the facts that a reasonably diligent plaintiff would have discovered." Merck & Co. v. Reynolds, ___ U.S. ___, 130 S. Ct. 1784, 1793 (2010). In doing so, the Supreme Court recognized that when drafters have written the word "discovery" into a limitations period–even outside of the fraud context–"state and federal courts have typically interpreted the word to refer not only to actual discovery, but also to the hypothetical discovery of facts a reasonably diligent plaintiff would know." Id.

Therefore, the Court finds that the "discovery rule" has proper application in this case. Because the Court finds a reasonably diligent plaintiff would have read the 2005 UFOC–the document through which Defendants are charged to provide plaintiffs notice of any kickbacks and other crucial information–the Court finds that Plaintiffs had knowledge of Sprock's ownership by virtue of receiving the UFOC. See Franze v. Equitable Assurance, 296 F.3d 1250, 1254-55 (11th Cir. 2002) (finding that it is an investor's

19

responsibility to read a prospectus and an investor is charged with knowledge of any fact contained in a prospectus, regardless of whether he actually reads it or not); <u>Desai v. SafeCo. Ins. Co. of Am.</u>, 328 S.E.2d 376, 378 (Ga. Ct. App. 1985) (finding that because the plaintiffs had the insurance policy in their possession, they were charged with notice of the policy's terms), superceded on other grounds, <u>Sanders v. Allstate Ins. Co.</u>, 428 S.E.2d 575, 577 (Ga. Ct. App. 1985). The Court is not persuaded that an amended UFOC is "junk mail" which a reasonably diligent plaintiff would not read. This document "described in detail the Moe's franchise system, including but not limited to information regarding Moe's, its predecessors and affiliates, the franchise's business experience, all ongoing litigation, the investment and financing requirements of franchisees, and both franchisor and franchisee's ongoing obligations." Dkt. No. [199-2] at ¶ 5. Thus, this document is similar to a prospectus which a shareholder would obtain from a corporation, and a diligent plaintiff would seek to discover how–if any–its obligations have changed and what new disclosures its franchisor was making.

Plaintiffs argue that even if they should have read the UFOC, knowledge that Sprock owned a stake in SOS was not sufficient to put them on notice that

he was receiving kickbacks. However, as Plaintiffs have plead, the kickback occurred by virtue of the Defendants' ownership of SOS. <u>See</u> 2d. Am. Cmpl., Dkt. No. [91-1] at ¶¶ 65-66 (stating that the Defendants owned SOS and derived kickbacks through SOS supply purchases). It was ultimately because of this ownership that Defendants were entitled to that "kickback" income. <u>Id.</u> But, moreover, as Georgia courts have recognized, "[n]otice sufficient to excite attention and put a party on inquiry shall be notice of everything to which it is afterwards found such inquiry may have led. Ignorance of fact, due to negligence, shall be equivalent to knowledge, in fixing the rights of the parties." <u>Webb v. Rusing</u>, 391 S.E.2d 709, 711 (Ga. Ct. App. 1990). Therefore, even if the kickback only flowed from the ownership, Plaintiffs are charged to diligently investigate when they receive information which would lead to discovery of impropriety. Thus, Defendants' Motion for Summary Judgment [199] is **GRANTED** as to these Plaintiffs.

### 2. Brain Ferris, CCM Restaurants, JFM Restaurants, and SMI Restaurants

Unlike the Plaintiffs who are charged with knowledge of Sprock's SOS

21

ownership by virtue of the UFOC, Brian Ferris[4] had actual knowledge of

Sprock's ownership "around 2004 or maybe early 2005." Def.'s SMF, Dkt. No.

[199-2] at ¶ 31. And, neither Ferris or his entities filed suit until November 21,

2007. Id. at ¶ 22. For the same reasons as above, the Court finds that Ferris'

knowledge that Defendants owned an equity stake in SOS put him and his

entities on inquiry notice to investigate possible fraud. Thus, Defendants'

Motion is **GRANTED** as to these Plaintiffs.

### 3. Plaintiffs Neil Griffeth and Gryphmore Foodservices of Kentucky, Inc.

Plaintiff Neil Griffeth, the operator of Gryphmore Foodservices of

Kentucky, testified that he received the 2005 UFOC sometime before he signed

a new deal on August 18, 2005, but he does not remember when he actually

received the document. Griffeth Dep., Dkt. No. [199-10] at 4-6. If these

Plaintiffs received the UFOC on or before August 16, 2005, their claims would

certainly be barred as these Plaintiffs filed suit on November 21, 2007. Dkt. No.

[199-2] at ¶ 22. But, because the Plaintiffs negotiated a waiver provision which

waived the contractual limitations provision for any non-accrued claims as of

---

[4]Brian Ferris operated Plaintiffs CCM Restaurants, JFM Restaurants, and SMI Restaurants. Def.'s SMF, Dkt. No. [199-2] at ¶ 30.

August 16, 2006, the Court finds there is a genuine issue of material fact as to whether Plaintiffs' claims are barred by the contractual limitations provision. Moreover, the Court notes that because the limitations period is an affirmative defense, Defendants bear the burden of proving that the limitations period applies, and correspondingly, when these Plaintiffs received the 2005 UFOC. See Walker v. Melton, 489 S.E.2d 63, 65 (Ga. Ct. App. 2007) (finding that the burden is on the defendant to show the applicability of a statute of limitations as it is an affirmative defense); Desai, 328 S.E.2d at 378 (implicitly finding that the contractual limitations provision was an affirmative defense, but not one that had to be specifically plead under Georgia pleading standards). As these Plaintiffs could have received the documents minutes before signing the new deal, or even on August 17, 2005 without becoming subject to the provision, the Court cannot find as a matter of law that these Plaintiffs' claims are barred. Thus, Defendants' Motion for Summary Judgment is **DENIED** as to these Plaintiffs.

### D. Motion for Summary Judgment as to Edward Tronnes

Defendants have next moved for summary judgment on all claims by Edward Tronnes, alleging that he does not have standing to bring these claims

and that, even if he did, Tronnes and his affiliated entity, Moe's Midwest, LLC, did not suffer any damages. However, regardless of Tronnes' standing issues, the Court finds that Plaintiff Tronnes cannot survive summary judgment as Plaintiff Tronnes has produced no affirmative evidence that he was damaged by Sprock's non-disclosures.

Edward Tronnes obtained a UFOC and signed a Marketing Development Agreement with Moe's in August 2003. Dkt. No. [203-3] at ¶ 1. In October 2004, Tronnes–along with his partners–opened a Moe's franchise location in Overton Park, Kansas. Id. at ¶¶ 3-5. This location's operating accounts were in the name of a Kansas limited liability company, Moe's Midwest, LLC. Id. at ¶ 6. Throughout the operation of the Overton Park location, IJ was never used as a distributor because Kansas was outside of IJ's distribution region. Id. at ¶ 10. And, even now, Tronnes does not know if SOS was in any way involved with the food distributors that the Overton Park location used. Dkt. No. [271] at 86:22-87:10, 88:20-23.

To oppose summary judgment, Tronnes states that there is a genuine issue of fact as to whether he was injured by Sprock's non-disclosure. Tronnes states that he remembers being visited by Salzburg of CRM and LaGratta of

AO 72A
(Rev.8/82)

SOS at his Overton Park location and he remembers that Salzburg had

documents with him that said "CRM" on them. Dkt. No. [223] at ¶ 23. As well,

he states that he has now been told by counsel that CRM was receiving fees and

splitting them with Sprock–i.e., he was advised that Sprock held an equity stake

in SOS. However, Tronnes has presented no evidence that Overton Park used

CRM or SOS; thus, there is no way that Tronnes could be damaged by the non-

disclosure as the federal regulations only require disclosure of funds "to be

received by the franchisor or persons affiliated with the franchisor <u>from</u>

<u>suppliers to the prospective franchisee</u> . . . ." 16 C.F.R. § 436.1(a)(11) (2005).

Tronnes' statement that Salzburg and LaGratta visited his location coupled with

the general kickback scheme in no way proves that supply-purchase proceeds

from the Overton Park location were being funneled through the CRM-LaGratta

agreement to Sprock. Tronnes has failed to produce an invoice or any other

record which would confirm his supplier was involved in the alleged scheme.

Thus, the Court finds Tronnes cannot mount a claim for any of his Georgia

claims–fraud, RICO, and negligent misrepresentation–as Plaintiff cannot prove

he was damaged, an essential element of each. <u>See</u> <u>infra</u>.

As well, the Court finds that Tronnes cannot bring a claim under the Kansas Consumer Protection Act. This act allows recovery when a defendant commits deceptive acts in the course of a consumer transaction within the state of Kansas. KAN. STAT. ANN. §§ 50-624, 626. Tronnes has alleged here that the predicate deceptive act was Sprock's non-disclosure of SOS's income received through kickbacks. However, because Plaintiff has produced no evidence that any Overton Park supply purchases were obtained by SOS and Sprock, Plaintiff's KCPA claim must fail. Defendants' Motion for Summary Judgment against Tronnes [203] is **GRANTED**.

### E. Defendants' Motion for Summary Judgment on All Damages Claims, or in the Alternative, Partial Motion for Summary Judgment on Fraud and RICO Counts and Plaintiff's Cross Motion for Summary Judgment on Counts II and III[5]

#### 1. Fraud (Count II)

Defendants and Plaintiffs both move for summary judgment on the remaining Plaintiffs' fraud claim (Count II). To prove fraud in Georgia, Plaintiffs are required to prove: "(1) a misrepresentation by defendant of a

---

[5]Defendants move to strike portions of Plaintiffs' Expert Report in relation to this motion. However, because the Court finds an issue of fact precludes summary judgment and the Court did not have to consider Plaintiff's expert report in reaching that conclusion, Defendants' Motion [242] is **DENIED** at this juncture. However, Defendants may file a motion in limine prior to trial on the expert issue if they so choose.

26

material existing fact, (2) with knowledge that it was false or with reckless

disregard as to whether it was true, (3) with intent to deceive plaintiff, and (4)

[that] plaintiff acted upon the misrepresentation in reasonable reliance upon its

veracity in a manner which caused proximate injury." Management Assistance,

Inc. v. Computer Dimensions, Inc., 546 F. Supp. 666, 671 (N.D. Ga. 1982)

(citing Brown v. Techdata Corp., Inc., 234 S.E.2d 787, 790 (Ga. 1977)).

Defendant first argues that Plaintiffs' fraud claims must fail as Plaintiffs

have not proven that the Defendants acted with scienter; i.e. that they intended

to deceive the Plaintiffs. Under federal regulations, franchisors are required to

disclose:

> (11) A description of the basis for calculating, and, if such
> information is readily available, the actual amount of, any revenue
> or other consideration **to be received** by the franchisor or persons
> affiliated with the franchisor from suppliers to the prospective
> franchisee in consideration for goods or services which the
> franchisor requires or advises the franchisee to obtain from such
> suppliers.

16 C.F.R. § 436.1(a)(11) (2005). However, Defendants maintain that Sprock's

failure to disclose his SOS interest was not intentional as, citing his deposition

testimony, he never expected to receive distributions from SOS and was

"amazed" when he was eligible for a distribution in 2004. Additionally, Sprock

27

stated that disclosure of his SOS relationship "never crossed his mind." Dkt. No. [209-1] at 17.

However, "[f]or the purposes of summary judgment, scienter and intent to deceive are determined on the basis of the [franchisor's] knowledge of the falsity of his representations at the time made to the prospective purchaser." Hudson v. Pollack, 598 S.E.2d 811, 814 (Ga. Ct. App. 2004). Here, the Court finds that there is an issue of fact as to whether Sprock acted with scienter. Plaintiffs have pointed to evidence that the federal regulations charged Sprock with disclosing any revenues "to be received," that Sprock had a "kickback" arrangement with LaGrotta as of 2001, and that with knowledge of the agreement to split net revenues, Sprock knowingly failed to disclose that he had an SOS interest since 2001. The Court finds that the ability to receive proceeds under the arrangement, even though profits did not yet exist, would have required disclosure as the ability to obtain income would be income "to be received" under the arrangement. But, Defendants have pointed to evidence that Sprock never thought that he needed to disclose the SOS agreement until he received payment, and upon receiving news that he would be paid, he disclosed SOS in the 2004 UFOC. Therefore, the Court finds that an issue of fact as to

28

Sprock's intent to deceive precludes summary judgment for either party on the fraud count.

### 2. Negligent Misrepresentation (Count III)

Plaintiffs next move for summary judgment on their negligent misrepresentation claim. A claim for negligent misrepresentation in Georgia is similar to an intentional fraud claim except that negligence is substituted for the intent to deceive element. <u>Prince Heaton Enters. v. Buffalo's Franchise Concepts</u>, 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000). However, like above, the Court finds that there is an issue of fact which precludes finding for the Plaintiffs on this claim. The parties dispute when SOS was created, when Sprock obtained an interest in the CRM-LaGratta agreement, and whether CRM and SOS actually benefitted the Plaintiffs such that they would not have been damaged by the non-disclosure. Thus, the Court cannot find as a matter of law that Defendants made a negligent misrepresentation.

### 3. RICO

Defendants next move for summary judgment on Plaintiffs' RICO claim. Namely, Defendants argue that Plaintiffs cannot prove the predicate act alleged in the Amended Complaint - theft by deception.

> Theft by deception is committed when a person "obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." O.C.G.A. § 16-8-3(a). "A person deceives if he intentionally: (1) Creates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; [or] (2) Fails to correct a false impression of an existing fact or past event which he has previously created or confirmed...." O.C.G.A. § 16-8-3(b). Although O.C.G.A. § 16-8-3(b)(2) does not specifically state that a deceiving person must "know[ ] or believe[ ]" an impression is false, that state of mind is implicit in the requirement of O.C.G.A. § 16-8-3(b)(2) that a deceiving person "intentionally" fail to correct a false impression; without knowledge or belief that an impression is false, there can be no intentional failure to correct it. Deceit does "not, however, include ... exaggeration by statements unlikely to deceive ordinary persons in the group addressed." O.C.G.A. § 16-8-3(c).

Avery v. Chrysler Motors Corp., 448 S.E.2d 737, 738 (Ga. Ct. App. 1994).

Here, the Court also finds that an issue of fact precludes summary judgment on Plaintiffs' RICO claim. As seen above, construing the facts most favorably to the Plaintiffs, Sprock knew that he had an ownership percentage in the LaGratta-CRM agreement by 2001 and failed to disclose this interest. Thus, Sprock created a false impression of an existing fact–that he did not have a personal interest in the supply chain–which he knew was not true at the time he did not disclose that interest in Item 8. As well, there is an issue of fact as to whether the Plaintiffs were helped or harmed by SOS. Plaintiffs have presented

30

evidence that but for CRM and LaGratta's agreement, Tyson's Mexican

Original (Tyson's) chicken price would have been cheaper. Pl.'s Resp. SMF,

Dkt. No. [243-1] at ¶ 35. Thus, the Court cannot find as a matter of law that a

reasonable jury could not find the Defendants committed theft by deception.

### 4. Damages

Defendants also move for summary judgment on all of Plaintiffs' tort

claims, alleging that the Plaintiffs cannot prove that they were damaged by

Sprock's failure to disclose his ownership stake in SOS. However, as seen

above, the Court finds that there are issues of fact which preclude finding for

Defendants at this time. Plaintiffs have presented evidence that Tyson's would

have not charged the franchisees as much for chicken if Tyson's had not had to

pay the rebates to CRM and SOS, and there is evidence that Sprock had an

interest in the CRM-LaGratta agreement even before SOS was formally

incorporated. Thus, because there is evidence that Sprock held an interest since

the beginning of the Moe's franchise–since the first two Moe's stores were

opened–the Court cannot find that franchisees were not damaged as at least

Tyson's would have charged less had it not had to pay rebates to CRM and

SOS.

As well, the Court is not persuaded that Sprock's failure to receive a payment until 2004 changes this analysis. Because Sprock was entitled to half of the revenues after expenses, it was in his and SOS's interest to make the company as profitable as possible beginning in 2001. Just because Sprock did not receive a payment until 2004 does not mean that Plaintiffs did not pay more for chicken, etc. in the interim, or that SOS did not have an incentive to negotiate deals with suppliers which would make the company more profitable in the long run so that Sprock could receive a payout. Thus, the Court finds that an issue of fact precludes judgment for Defendants on all of Plaintiffs' aforementioned tort claims. Defendants' and Plaintiffs' Motions for Summary Judgment [209, 210] are **DENIED**.

### F. Defendants' Motion for Summary Judgment Against Pre-August 28, 2002 Recipients

Defendants next move for summary judgment against all Plaintiffs who received their UFOCs before August 28, 2002, or before SOS was formally created. Defendants allege that these Plaintiffs could not have been misled as Sprock did not yet have an interest in SOS which would have mandated disclosure. However, as seen above, Plaintiffs have pointed to evidence that LaGratta stated he and Sprock had a revenue-sharing agreement in 2001 as of

the first two Moe's store openings and before SOS was formally created. Thus, the Court finds an issue of fact precludes summary judgment for Defendants at this time. Defendants' Motion [200] is **DENIED**.

### G. Defendants' Motion for Summary Judgment as to David Titshaw's Intentional Infliction of Emotional Distress Claim

Defendants next move for summary judgment on Titshaw's intentional infliction of emotional distress ("IIED") claim. They argue that there is no evidence that Sprock and Moe's conduct rose to the level of extreme and outrageous, that Titshaw did not suffer "severe emotional distress" at their hands, and that Titshaw's claim is at bottom a tortious interference claim which this Court has already dismissed. Dkt. No. [246] at 2.

To establish a claim for intentional infliction of emotional distress, a plaintiff must prove that:

> (1) the conduct giving rise to the claim was intentional or reckless; (2) the conduct was extreme and outrageous; (3) the conduct caused emotional distress; and (4) the emotional distress was severe. The defendant's conduct must be so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Whether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress is a question of law.

AO 72A
(Rev.8/82)

<u>Frank v. Fleet Fin., Inc.</u>, 518 S.E. 2d 717, 720 (1999) (internal citations and quotations omitted).  "Although the existence of a special relationship in which one person has control over another, such as the employer-employee relationship, may contribute to the outrageousness of the situation, it is not dispositive." <u>Miraliakbari v. Pennicooke</u>, 561 S.E.2d 483, 487 (Ga. Ct. App. 2002).

Plaintiff alleges that Defendants engaged in a pattern of conduct intended to "get even" with the Plaintiff.[6] Essentially, Plaintiff asserts that Sprock became upset with him and tried to remove him as the day-to-day manager of his Moe's franchise, tried to obtain a third-party buyer to buy-out the Plaintiff's interest in his franchise, left messages on the Plaintiff's business-partner's voicemail that he wanted Titshaw to be removed as day-to-day manager, and openly expressed his displeasure with Titshaw through "tirades" to third-parties. Dkt. No. [234] at ¶¶ 23, 26, 36-41, 52-54. Defendant responds that Sprock wanted Titshaw removed because he defaulted on the terms of his MDA and Moe's had a right to terminate his franchise. Dkt. No. [208-2] at ¶¶ 5-10.

---

[6]In support of this allegation, Plaintiff has attached Exhibits E-I which purport to be internal emails. However, Plaintiff did not provide these emails to the Defendants during discovery. Thus, the Court will not consider them. <u>See</u> FED. R. CIV. P. 37(c)(1).

AO 72A
(Rev.8/82)

Plaintiff has failed to establish that Defendants' conduct was extreme or outrageous. All of Plaintiff's stress and injury arise out of an ordinary business dispute–Plaintiff defaulted on the MDA and Moe's was not impressed. See Jarrard v. United Postal Serv., 529 S.E.2d 58, 60 (Ga. Ct. App. 2000) ("Sharp or sloppy business  practices, even if in breach of contract, are not generally considered as going beyond all reasonable bounds of decency as to be utterly intolerable in a civilized community."). Moreover, much of the complained conduct was not directed at the Plaintiff but rather third parties, and he did not learn about the conduct until after this suit was filed. See Dkt. No. [208-2] at ¶ 21; Wellborn v. DeKalb Cnty. Sch. Dist., 489 S.E.2d 345, 347 (Ga. Ct. App. 1997) ("[A] claim for intentional infliction of emotional distress is allowed only when the intentional act was directed toward the plaintiff."). Thus, Defendants' Motion for Summary Judgment as to Titshaw"s IIED Claim [208] is **GRANTED**.

### III. Conclusion

Defendants' Motion for Summary Judgment as to Moe's Bros., LLC [175] is **GRANTED** and Plaintiff Moe's Bros., LLC's Motion to Reinsert Moe's Brother's Ventures Inc. In Lieu of Nominal Plaintiff Moe's Bros., LLC

[196] is **DENIED**. As well, Defendant Moe's Southwest Grill, LLC's Motion for Summary Judgment as to Counts I-III [199] is **GRANTED, in part** and **DENIED, in part**. Defendant Moe's Southwest Grill, LLC's Motion for Summary Judgment as to Pre-August 28, 2002 UFOC Recipients [200],Defendants Moe's Southwest Grill, LLC, Moe's Southwest Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin Sprock, III's Motion for Summary Judgment as to All Claims for Damages, and in the Alternative, Partial Summary Judgment as to Fraud and Georgia RICO Claims [209], and Plaintiffs' Motion for Partial Summary Judgment as to Counts II & III [210] are **DENIED**.  Defendants Moe's Southwest Grill, LLC, Moe's Southwest Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin Sprock, III's Motion for Summary Judgment as to Edward Tronnes [203] and Defendants Moe's Southwest Grill, LLC, Moe's Southwest Holding, LLC, Raving Brand Holdings, Inc., Raving Brands, Inc., H. Martin Sprock, III's Motion for Summary Judgment as to IIED [208] are **GRANTED**.

Following these motions, the following Plaintiffs' claims are dismissed: Rounding Third, LLC; The Jimmy Legs Group, LLC; 3M Restaurants, LLC; Edward Tronnes; Taylor Investment Partners, II; David Titshaw; Moe's Bros.

LLC; CCM Restaurants, LLC; JFM Restaurants, LLC; SMI Restaurants, LLC; Moe's Brunswick, LLC; Brian Ferris; and, John McKeown. The remaining parties are directed to file a joint, proposed pre-trial order within 30 days.

**SO ORDERED**, this  17th  day of April, 2012.


RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

37