IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

MASSEY, INC., *et al.*,           :
                                  :
        Plaintiffs,               :
                                  :
v.                                :       CIVIL ACTION NO.
                                  :       1:07-CV-0741-RWS
MOE'S SOUTHWEST GRILL,            :
LLC, *et al.*,                    :
                                  :
        Defendants.               :
                                  :

## ORDER

This case came before the Court for a bench trial beginning January 12, 2015. After reviewing the record and considering the evidence and arguments of counsel, the Court enters the following findings of fact and conclusions of law.

### Findings of Fact

**I.      Creation and Development of Moe's Southwest Grill**

1.      Formed in July 2000 as a Georgia limited liability company, Moe's Southwest Grill, LLC ("Moe's") is in the business of franchising fast, casual Mexican food restaurants.

2.      In approximately January 2001, Moe's began marketing its franchise to potential franchisees. From approximately 2001 to 2007, Moe's franchised the "Moe's Southwest Grill" restaurants, growing from 17 stores at the end of 2001 to 343 stores at the end of 2006.

3.      Prior to joining the Moe's franchise, each prospective franchisee received a Uniform Franchise Offering Circular ("UFOC"), which described in detail the Moe's franchise system, including but not limited to information regarding Moe's, its predecessors and affiliates, the franchise's business experience, all ongoing litigation, the investment and financing requirements of franchisees, and both franchisor and franchisee's ongoing obligations.

4.      In keeping with the standard in the industry, Moe's regular business practice was to update its UFOC in the first quarter of each calendar year.

5.      To become a Moe's franchisee, potential franchisees were required to execute both a Market Development Agreement and a Franchise Agreement. The standard Moe's Market Development Agreement was marked as Exhibit C to each UFOC, and detailed the franchisee's obligations as a developer of the

Moe's franchise and granted a franchisee the right to develop one or more
Moe's franchises.

6.      The standard Moe's Franchise Agreement was marked as Exhibit
D to each UFOC, and detailed the obligations of Moe's and the franchisee with
respect to the operation of a specific Moe's franchise.

7.      Each Moe's franchisee executed a single Market Development
Agreement, which covered all of the franchises operated by the franchisee. By
contrast, each Moe's franchise is operated under a separate Franchise
Agreement. For example, if a franchisee sought to operate three Moe's
franchises, that franchisee was required to execute a single Market
Development Agreement and three separate Franchise Agreements.

8.      The relevant Moe's Market Development Agreements executed by
Plaintiffs contain the following language:

12. FRANCHISE AGREEMENTS.

(a)      Upon the due performance by Developer within the time periods
set forth, of all of the requirements set forth above (including, without
limitation, payment of the Development Fee and Franchise Fee, and
satisfaction of all construction and training requirements) with respect to
any MOE'S SOUTHWEST GRILL restaurant contemplated by this
Agreement, Franchisor, except as set forth below, will execute, issue and

3

deliver to Developer Franchisor's then-current form of Franchise Agreement to operate such MOE'S SOUTHWEST GRILL restaurant; provided, however, that, in the event that this Agreement is for the development of more than one (1) MOE'S SOUTHWEST GRILL restaurant, the Franchise Fees and royalties payable under any Franchise Agreement for a MOE'S SOUTHWEST GRILL restaurant to be built and operated within the Territory shall be at the rate set forth in Exhibit A. In addition, in the event that this Agreement is for the development of more than one (1) MOE'S SOUTHWEST GRILL restaurant, during the term of this Agreement or any renewal hereof, with respect to any Franchise Agreement executed for a MOE'S SOUTHWEST GRILL restaurant to be built and operated within the Territory, Franchisor agrees that: . . .

(b) . . . Developer shall comply with Franchisor's then-current franchising policies and procedures for issuance of each Franchise Agreement . . . . If and when any Franchise Agreement contemplated in this Agreement is executed by Franchisor, it shall supersede this Agreement and govern the relations between the parties with respect to the particular restaurant.

(Def.'s Tr. Ex. 28).

9.      The relevant Moe's Market Development Agreements executed by

Plaintiffs further provide:

24.      ENTIRE AGREEMENT. This Agreement contains the entire agreement between the parties hereto and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties that have been relied upon by either party other than those set forth herein. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by both Developer and Franchisor.

4

25.     DEVELOPER'S ACKNOWLEDGMENTS. Developer understands and acknowledges that there are significant risks in any business venture and that the primary factor in Developer's success or failure under this Agreement will be Developer's own efforts. IN ADDITION, DEVELOPER ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO DEVELOPER OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO DEVELOPER AND THAT DEVELOPER HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR AND DEVELOPER'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(Id.)

10.     The relevant Moe's Franchise Agreements executed or assumed by Plaintiffs contain the following language:

7.     Standards and Uniformity of Operation. Franchisee recognizes the mutual benefit to Franchisee, Franchisor and other Franchisees of Franchisor of the uniformity of appearance, service, products and advertising of the MOE'S System and understands that such uniformities are necessary for the successful operation of the MOE'S SOUTHWEST GRILL restaurants. Franchisee also acknowledges that products sold under the MOE'S name and restaurants using the MOE'S System have a reputation for excellence. This reputation has been developed and maintained by Franchisor, and Franchisee acknowledges that it is of the utmost importance to Franchisor, and to all other Franchisees that such reputation be maintained. To this end Franchisee covenants and warrants with respect to the operation of the MOE'S SOUTHWEST GRILL restaurant at the Franchised Site that Franchisee and its employees will

5

comply with all of the requirements of the MOE'S System and will
throughout the term of the agreement:

(a)    Operate the restaurant and prepare and sell all products sold therein
in accordance with the specifications, standards, business practices and
policies of Franchisor now in effect or hereafter promulgated by
Franchisor for its Franchisees, and comply with all requirements of the
MOE'S System as they are now or hereafter established.
. . .

(g)    Use only ingredients, supplies, furnishings and equipment that
conform to the standards and specifications designated by Franchisor.
Such items may be purchased from any source that can supply items that
meet such standards and specifications.

(Def.'s Tr. Ex. 29).

11.    The relevant Moe's Franchise Agreements executed by all

Plaintiffs except Parde Roswell further provide:

34.    Entire Agreement. This agreement and any addendum hereto
contains the entire agreement between the parties hereto relating to the
operation of the restaurant at the Franchised Site and there are no
representations, inducements, promises, agreements, arrangements or
undertakings, oral or written, that have been relied upon by the parties
other than those set forth herein. No agreement of any kind relating to the
matters covered by this agreement shall be binding upon either party
unless and until the same is made in writing and executed by all
interested parties.

35.    Franchisee's Acknowledgments.

(a)    Franchisee assumes sole responsibility for the operation of the
business Franchised hereunder and acknowledges that, while Franchisor

6

may furnish advice and assistance to Franchisee from time to time during the term of this agreement, Franchisor has no legal or other obligation to do so except as specifically set forth herein. In addition, Franchisee acknowledges that Franchisor does not guarantee the success or profitability of the business Franchised hereunder in any manner whatsoever and shall not be liable therefor; in particular, Franchisee understands and acknowledges that the success and profitability of the business Franchised hereunder depend on many factors outside the control of either Franchisor or Franchisees (such as interest rates, unemployment rates, demographic trends and the general economic climate), but principally depend on Franchisee's efforts in the operation of the business.

Franchisee understands and acknowledges that there are significant risks in any business venture and that the primary factor in Franchisee's success or failure in the business Franchised hereunder will be the Franchisee's own efforts. IN ADDITION, FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO FRANCHISEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO FRANCHISEE, AND THAT FRANCHISEE HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR AND FRANCHISEE'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(Id.)

12.     The Parde Roswell Moe's Franchise Agreement executed in 2007 contains substantially the same language:

34.    Entire Agreement. This agreement and any addendum hereto contains the entire agreement between the parties hereto relating to the operation of the restaurant at the Franchised Site and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, that have been relied upon by the parties other than those set forth herein and in the Uniform Franchise Offering Circular. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties.

35.    Franchisee's Acknowledgments.

(a)    Franchisee assumes sole responsibility for the operation of the business Franchised hereunder and acknowledges that, while Franchisor may furnish advice and assistance to Franchisee from time to time during the term of this agreement, Franchisor has no legal or other obligation to do so except as specifically set forth herein. In addition, Franchisee acknowledges that Franchisor does not guarantee the success or profitability of the business Franchised hereunder in any manner whatsoever and shall not be liable therefor; in particular, Franchisee understands and acknowledges that the success and profitability of the business Franchised hereunder depend on many factors outside the control of either Franchisor or Franchisees (such as interest rates, unemployment rates, demographic trends and the general economic climate), but principally depend on Franchisee's efforts in the operation of the business.

(b)    Franchisee understands and acknowledges that there are significant risks in any business venture and that the primary factor in Franchisee's success or failure in the business Franchised hereunder will be the Franchisee's own efforts. IN ADDITION, FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO FRANCHISEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING

AO 72A
(Rev.8/82)

CIRCULAR PROVIDED TO FRANCHISEE, AND THAT
FRANCHISEE HAS UNDERTAKEN THIS VENTURE SOLELY IN
RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM
FRANCHISE OFFERING CIRCULAR AND FRANCHISEE'S OWN
INDEPENDENT INVESTIGATION OF THE MERITS OF THIS
VENTURE.

(Def.'s Tr. Ex. 54.)

13.     In each year's UFOC from 2001-2003, Item 8 of the Moe's UFOC

states in relevant part:

You must purchase certain paper products including, among other things,
plates, cups, boxes and containers bearing the "MOE'S SOUTHWEST
GRILL" name or other trade names or service marks through certain
designated suppliers who are authorized to manufacture these products.
You must purchase certain hardware and software for the operation of a
MOE'S SOUTHWEST GRILL restaurant. Those suppliers are not
affiliated with us. Neither we nor any of our affiliates will derive any
income from these purchases.

We do not negotiate purchase agreements with suppliers for the
benefit of franchisees. Due to the volume of purchases made from
suppliers by the Company and its franchisees, certain suppliers
provide discounts to the Company and its franchisees. The
Company does not negotiate for these discounts and does not
monitor the amount of any discounts to franchisees.

(Def.'s Tr. Ex. 1-3.)

14.     The 2001-2003 UFOCs also provided:

The following table lists important provisions of the Market
Development Agreement. You should read these provisions in the

9

> Market Development Agreement attached to this offering circular as Exhibit C. . . .

| Integration /merger clause | Section 24 | Only terms of the Market Agreement are binding (subject to state law). Any other promises may not be Enforceable. |
|---|---|---|

(Id.)

16. The 2001-2003 UFOCs also provided:

> The following table lists important provisions of the Franchise Agreement. You should read these provisions in the Franchise Agreement attached to this offering circular as Exhibit D. . . .

| Integration /merger clause | Section 34 | Only terms of the Franchise Agreement are binding (subject to state law). Any other promises may not be enforceable. |
|---|---|---|

(Id.)

16. The 2001-2003 UFOCs do not identify SOS or Tony LaGratta as an affiliate of Moe's, nor do they disclose that Mr. Sprock has any ownership interest in SOS.

17. The 2004 UFOC, issued on March 18, 2004, made the following disclosure in Item 8 concerning SOS and Mr. Sprock's role therein:

> Systems Opportunities Savings ("SOS") provides food brokerage services to MOE's franchisees. Franchisees are able to use SOS on a

voluntary basis. We do not derive revenue, directly or indirectly, from SOS in connection with the services SOS provides to our franchisees. H. Martin Sprock, III, our Manager, Chief Executive Officer and President, is projected to become a minority equity holder in SOS during fiscal year 2004.

(Def.'s Tr. Ex. 4.)

18.     The foregoing disclosure made no reference to affiliates, and "we" is defined in the UFOC as Moe's Southwest Grill, LLC.

19.     The 2005 UFOC, issued on April 1, 2005 and subsequently distributed to prospective and existing franchisees, disclosed the relationship between Mr. Sprock and SOS and specified Mr. Sprock's ownership interest in SOS. The 2005 UFOC stated that Mr. Sprock was a 50% equity holder in SOS and that SOS was a supplier of food brokerage services to Moe's franchisees.

20.     The 2005 UFOC provided at Item 8:

One of our approved suppliers, Systems Opportunities Savings ("SOS") provides food brokerage services to MOE's franchisees. SOS is indirectly related to us through Martin Sprock, our Chief Executive Officer and President, who is a 50% equity holder in SOS. Individually, Mr. Sprock also holds a small minority interest in two other suppliers in our system: Atlanta Lighting and Kudzu International. We do not derive revenue, directly or indirectly, from any of these suppliers in connection with the services or products they provide to our franchisees.

(Def.'s Tr. Ex. 5.)

21. Again, the foregoing disclosure made no reference to affiliates, and "we" is defined in the UFOC as Moe's Southwest Grill, LLC.

## II.   Formation of the Moe's Supply Chain Management Program

22.   As of 2000-2001, Mr. LaGratta was the paid employee of another Sprock-sponsored concept, Planet Smoothie, for which he managed food supply and distribution services and negotiated purchasing contracts.

23.   Seeking to retain Mr. LaGratta's services, Mr. Sprock and Mr. LaGratta discussed the concept of a food services management company – one which would not necessarily be limited to the Moe's account. Mr. Sprock offered to help the company obtain clients. These discussions occurred before Moe's established the relationship with CRM.

24.   Mr. LaGratta and Mr. Sprock had a "loose understanding" that Mr. LaGratta would form an independent company to manage the Moe's supply chain, and that Mr. Sprock would be involved in that company and possibly receive revenue therefrom.

25.   Mr. LaGratta reached out to Steve Salzberg to discuss the possibility of Moe's utilizing CRM as a food distributor.

12

26.     CRM was formed in 1984 and is 100% owned by Mr. Salzberg. Mr. Salzberg does not own (in whole or in part) or operate any of the Defendants.

27.     Mr. Sprock supported CRM's involvement in the Moe's supply chain. He believed that CRM's aggregate clientele provided it with a level of purchasing power when negotiating pricing and other terms with food suppliers that a fledgling franchise system such as Moe's would not have. In fairness to Mr. Sprock, his primary motivation in supporting the proposed supply chain was to help assure the success of the franchisees, not to create a separate revenue source for himself. Mr. Sprock was attempting to grow the Moe's brand as quickly as possible which required happy, satisfied franchisees. His ultimate success depended upon this growth as he would ultimately sell the brand to someone else.

28.     The purchasing power of CRM through its Chain Links Buying Group between 2001 and 2007 is estimated at between $250,000,000 and $300,000.000. At no time since CRM participated in the Moe's system has Moe's ever accounted for more than 25-30% of the revenues of CRM.

29.     CRM agreed to help Mr. LaGratta create and run the food supply chain and distribution network for Moe's.

30.     International Jobbers ("IJ") was identified by CRM and Mr. LaGratta as a distributor for Moe's franchisees for particular regions such as North Georgia.

31.     As a distributor, IJ was capable of receiving and delivering orders of various food products for certain Moe's franchisees. The Plaintiff franchisees would place orders with IJ in lieu of contacting individual suppliers and having to coordinate delivery schedules for each different supplier.

32.     In 2001, CRM and IJ agreed that IJ would pay CRM a brokerage commission in the amount of 2% (the "CRM Commission") of all qualifying Moe's franchisee purchases paid to IJ. This 2% commission is CRM's customary charge. Certain products (Coca-Cola beverages and Economics Labs household cleaning products) were exempted from the CRM Commission.

33.     In 2001, CRM agreed to pay Mr. LaGratta half the CRM Commission attributable to the Moe's account. At that time, there were no sources of revenue to CRM from the food supply chain and distribution network for Moe's other than the CRM Commission.

14

34.     At no time prior to 2005 did Defendants know that CRM had

negotiated any compensation – fees, commissions, discounts, or the like – for

itself or for SOS with any food manufacturers. Specifically, at no time prior to

2005 were any of the named Defendants aware of any compensation or

marketing allowance arrangement between CRM and any food suppliers.

35.     Mr. Sprock was aware of the relationship between Mr. LaGratta

and CRM, including the commission structure, and he approved of it.

36.     On August 28, 2002, Mr. LaGratta formed SOS Foodservice

Consultants, LLC ("SOS"), a company through which he continued his work on

behalf of the Moe's food supply and distribution chain. SOS also performed

similar services for accounts other than Moe's. Mr. Sprock was not aware that

he had been listed by Mr. LaGratta as a member of SOS in its August 28, 2002

Articles of Incorporation. But Mr. Sprock did understand that he had a one-half

interest in SOS.

37.     By late 2002, CRM began making payments to SOS rather than

Mr. LaGratta.

38.     The agreement between Mr. LaGratta and Mr. Sprock was

formalized in 2004. The 2004 SOS operating agreement provides that Mr.

15

Sprock and Mr. LaGratta will share equally any profits after payment of all SOS expenses and salaries to Mr. and Mrs. LaGratta in the amount of $150,000.00. It was not limited to SOS's share of any commissions relating to the Moe's account. Mr. Sprock was compensated from SOS's share of the CRM Commissions and his compensation did not result in CRM or SOS charging any additional fees or commissions. Moe's never – directly or indirectly – received any share of the CRM Commission.

39.     In 2001-2003, Mr. Sprock received no income related to purchases by any of the Plaintiffs.

40.     Mr. Sprock received his first distribution from SOS on August 25, 2004.

41.     After Mr. Sprock began receiving distributions from SOS in 2004, the CRM Commissions (shared with SOS) dropped from 2% of qualifying purchases to 1.5% in May 2005, and then ultimately to 1% in July 2006, as the size of the Moe's franchise system grew significantly in that time frame.

42.     At all relevant times, Mr. LaGratta has been the manager of SOS. Mr. LaGratta never owned any interest in Moe's, nor was he ever an officer or director of Moe's. Mr. LaGratta made all operational decisions relating to SOS.

43.     Mr. Sprock performed no functions for SOS except to recommend it to potential clients in the restaurant industry. Also, he brought other Raving Brands franchisors with which he was personally involved as an owner-operator to SOS as additional clients (including Boneheads Seafood Grill, Doc Green's Gourmet Salads, Mama Fu's Asian Noodle House, and Shane's Rib Shack) .

44.     Mr. Sprock had no ownership in CRM. Mr. Sprock never had the power or right to control CRM, nor did he ever attempt to exercise control over CRM.

45.     There was no discussion between Mr. Salzberg and Mr. LaGratta about sharing any revenue streams with Moe's or Mr. Sprock. In fact, Mr. Salzberg believes he did not become aware of Mr. Sprock's interest in SOS until sometime in 2003.

46.     Neither SOS nor CRM ever directly or indirectly owned, controlled, or held any power to vote any of Moe's outstanding securities.

47.     Mr. Sprock was at all times relevant to this case the Chief Executive Officer of Moe's.

48.     Mr. Sprock resigned his interest in SOS on September 1, 2006. At that time, CRM Commissions charged to IJ did not change.

17

49.     Mr. Salzberg and Mr. LaGratta attended franchise advisory council ("FAC") meetings and periodically reported to franchisees relating to issues having to do with the food purchasing and the supply and distribution chain. However, not all of the franchisees were aware that CRM and SOS were being paid commissions based on purchases by the franchisees.

50.     At the November 28, 2005 FAC meeting, franchisees learned about the third-party distribution program involving CRM and SOS. Moe's and the FAC created a task force to investigate the program.

51.     The task force and Plaintiffs made repeated requests for product specifications after learning about the commission-based compensation of CRM and SOS during the November 2005 FAC meeting. Plaintiffs believed they needed specifications for all of the products supplied by IJ in order to evaluate whether CRM and SOS were providing them with competitive prices.

52.     CRM and SOS did not cooperate with the task force. Rather, in an effort to protect their proprietary interest in the food distribution program they had developed, they declined to provide information to the franchisees that would have assisted them in obtaining competitive prices from vendors.

53.     Mr. Sprock felt that the efforts of some franchisees to break away

18

from the distribution program created by CRM and SOS threatened the success of the entire Franchise system, and Moe's therefore was only minimally cooperative in the investigation. On April 5, 2006, Moe's sent a letter to vendors notifying them that the FAC supply chain task force would be reviewing and analyzing the Moe's purchasing and supply chain management program, and that Bob Leonard was the appointed FAC chairman. By the letter, Moe's advised vendors that if they received a request for information, the vendor should submit an authorization to release information to Moe's.

54.    In fact, Moe's did not have specifications for many of the food items in its inventory. But Moe's lack of candor and transparency regarding specifications, as well as on the part of CRM and SOS, fueled the franchisees' suspicions that prices were inflated in order to pay commissions to CRM and SOS.

55.    Following the disclosure of the Moe's supply chain in November 2005, franchisees Guy Campbell and Angelo Dajon – both FAC committee members – were tasked with reviewing every Moe's contract for rebates and marketing funds. They reported back to the FAC that they had no issues with the contracts.

19

56.     By managing the Moe's supply chain, CRM and SOS brought considerable value to the Moe's system.

57.     CRM and SOS brought value in the form of buying power that a small start-up franchise system would not otherwise have.

58.     Mr. Salzberg and Mr. LaGratta had a combined 40 to 50 years of experience in purchasing. Their services resulted in reasonable prices for franchisees. Plaintiffs failed to show that the prices CRM and SOS were able to procure for the Moe's franchisees could have been matched.

59.     The use of food procurement brokers is common. Moreover, in the franchise supply chain industry, the payment of brokerage commissions by vendors as well as distributors is not uncommon. A broker usually earns revenue directly from the supplier. Additionally, a broker is typically paid directly by the distributor.

60.     CRM did in fact separately negotiate manufacturer commissions directly from Filet of Chicken and other vendors. However, eliminating these commissions did not necessarily result in cheaper food prices to Moe's franchisees.

20

61.     On the other hand, CRM negotiated distribution agreements with distributors so as to prevent the distributors from obtaining sheltered income from suppliers. These "watchdog" services that an experienced broker provides to franchisees through auditing practices are valuable services.

62.     CRM and SOS used advanced systems for auditing food distributors such as IJ, causing IJ to refund IJ fuel surcharges, thus saving Moe's franchisees money. Mr. LaGratta would also audit the IJ Order Guide to ensure that the pricing was accurate and nothing was overbilled.

63.     CRM and SOS added value to Moe's franchisees and likely saved the Plaintiffs money as a result of (1) leveraging volume purchasing power on behalf of their clients collectively, (2) using their superior industry knowledge in negotiations, (3) lowering freight costs and arranging for efficient freight deliveries, and (4) obtaining discounts for the franchisees. Their efforts, on balance, lowered the landed cost of food for the Moe's franchisees.

### III.    Damages

64.     Each side called expert witnesses to testify as to damages issues. Plaintiffs called Kevin Golding, who testified that the fees CRM and SOS charged in the form of the CRM Commission from IJ damaged Plaintiffs

21

because the money was not given back to Plaintiffs.

65.    He further testified that he had studied the chicken costs of Plaintiffs during the years 2003-2007 and determined that the price of chicken IJ charged to Moe's franchisees was inflated. Mr. Golding testified that he assumed that all of the chicken purchased by Plaintiffs from Filet of Chicken during the relevant time frame had a  20% "pump" or maximum solution. He testified that he estimated overpayments on IJ products to try to put some scope and dimension on what the processing costs should have been, but that his objective was not to determine the amount of damages.

66.    The Filet of Chicken cost structure for each of the Moe's marinated chicken products in use from 2002-2007 was complicated. It included raw material costs for chicken, marinade and related ingredients. It further varied depending upon the mix of 5% fat and down trim with the 15% fat and down trim. Mr. Golding did not know what the percentage of the 5% and down product was used in the preparation of marinated chicken. He further admitted that 5% chicken was more expensive, and its inclusion would tend to narrow the difference between the hypothetical cost of chicken in his analysis and the actual price paid by the franchisees.

22

67.     Plaintiffs also called Shayne Smith, an accountant, to calculate the actual amount of CRM Commissions paid by each of the Plaintiffs and the amount of each Plaintiff's chicken purchases, in order to attempt to quantify damages.

68.     Defendants called Daniel Cenatempo in rebuttal, who testified that Mr. Golding's CRM Commission-based damages were not damages at all. Mr. Cenatempo explained that regardless of whether Mr. LaGratta was a contractor working with Moe's or an in-house purchaser working for a salary, he still needed CRM to obtain volume-based pricing and avoid street pricing. The CRM Commission charged by CRM in this case was its standard and customary fee for the benefit of access to CRM's Chain Links Buying Group used in purchasing negotiations and was not affected by the relationship between Moe's, CRM, SOS, Mr. LaGratta, and Mr. Sprock.

69.     Mr. Cenatempo also showed that Mr. Golding's "chicken damages" analysis was faulty. He pointed out flawed assumptions by Mr. Golding relating to costs that factor into the price of the Moe's marinated chicken product. Specifically, Mr. Golding used the market price data for raw

AO 72A
(Rev.8/82)

chicken, but not any of the other ingredients (such as marinade, additives and preservatives) used in the Moe's marinated chicken product.

70.     Additionally, Mr. Cenatempo showed that the use of a 15% and down fat product decreased the "raw chicken cost" Mr. Golding used as the basis for his calculations. Mr. Cenatempo further showed that adding in the more expensive 5% fat product that was actually blended with the 15% and under product resulted in a higher raw cost.

71.     Without providing any support, Mr. Golding estimated based on his experience that the 35 cent estimate he used for processing plant cost and margin for chicken product was "in the realm of reason" for each year of damages for which he created a raw chicken cost.

72.     Further, Mr. Cenatempo showed that Mr. Golding used an assumed 20% "pump" figure to account for the amount of water added to the chicken before packaging into 1 pound bags for shipment. In contrast, Mr. Cenatempo used the actual pump data provided by the manufacturer, Filet of Chicken, which shows a range of 12% to 25% over time, to show that the pump figure used by Mr. Golding was exaggerated. Mr. Cenatempo's analysis showed that when the proper amount of "pump" was factored in and the proper costs of

24

ingredients accounted for, the Plaintiffs actually *saved* money on chicken by using the supply chain established by CRM and Mr. LaGratta. He concluded that Moe's franchisees, including the Plaintiffs, saved on average $0.15 per pound over prevailing market rates.

73.     Mr. Cenatempo also showed that Mr. Golding's rate of chicken overcharge – a fluctuating rate for each year of claimed damages – was unsupported by the record. Specifically, Mr. Golding claimed that the "Actual Price" paid by franchisees he used to calculate the alleged overcharge was derived from Paul Parker. However, as noted by Plaintiffs' other expert, Mr. Smith, the invoices produced by Mr. Parker's entities (Parde and Parde Roswell) were limited and sporadic. Mr. Golding failed to describe an appropriate methodology or source for the "Actual Price" data.

74.     Mr. Cenatempo showed that the data for seven of the eleven stores owned by the Plaintiffs were incomplete. In particular, he showed that the absence of IJ invoices called into doubt calculations regarding the amount of chicken that was purchased and the amount of product sales to be excluded since they were exempt from the CRM Commission.

75.     With respect to the category of chicken damages, Mr. Golding did not determine the rate at which franchisees overpaid for chicken in 2002. As such, Mr. Smith assumed that the rate of overpayment was the same in 2002 as it was in 2003 (10.88%), even though the alleged rate of overpayment fluctuated from 2003 to 2007 from 3.46% to 23.85%.

76.     The Court finds the opinions of Mr. Cenatempo convincing. The damages evidence presented by Plaintiffs fails to establish that they suffered any losses caused by the relationship between CRM, SOS, Mr. LaGratta, and Mr. Sprock. On the contrary, the evidence shows that it is more likely that the relationship resulted in net savings to Plaintiffs.

## IV.     Plaintiffs

### A.     *Neil Griffeth; Gryphmore Foodservices of Kentucky, Inc.*

77.     Neil Griffeth and non-party Emily Morgales were fifty-fifty partners at the time they reviewed and signed the Moe's Market Development Agreement and Franchise Agreement on February 10, 2003.

78.     In March 2003, Mr. Griffeth and Ms. Morgales formed Gryphmore Foodservices of Kentucky, Inc. ("Gryphmore"). From that point forward, they

ran the operations of their first Moe's store through Gryphmore. This included all restaurant-related purchasing activities.

79.    Gryphmore and Moe's entered into a second Franchise Agreement dated August 18, 2005.

80.    On August 17, 2007, Gryphmore and Moe's entered into a third Franchise Agreement.

81.    Mr. Griffeth testified that at the initial meeting with Moe's, Daryl Dollinger gave him advice to watch for franchisors that obtain revenue from franchisee purchases of equipment, using an example of Domino's Pizza making money on franchisee purchases of pizza ovens.

82.    Mr. Griffeth first learned about the supply chain allegations after the initial lawsuit was filed.

### B.    Rounding Third, LLC

83.    James Killingsworth received a 2001 UFOC on March 11, 2002.

84.    On May 16, 2002, Plaintiff Rounding Third, LLC ("Rounding Third") was formed in Georgia.

85.    On May 28, 2002, Rounding Third executed a 1-store Market Development Agreement and Franchise Agreement.

86.     On August 9, 2004, Rounding Third entered into an Assignment and Assumption Agreement with AMI Restaurants, LLC and Moe's in connection with the Austell store. However, an executed agreement was not offered as evidence in the case.

87.     By the Assignment and Assumption Agreement, with the consent of franchisor Moe's, Rounding Third, LLC transferred its interests in the franchised Moe's store in Austell to non-party AMI Restaurant, LLC.

88.     Rounding Third received a copy of the 2005 UFOC on April 29, 2005. Rounding Third first asserted claims against Defendants on March 30, 2007.

## C.     *Parde, LLC and Parde Roswell, LLC*:

89.     Paul Parker received a 2001 UFOC in a meeting with Mr. Sprock 30-40 days after the grand opening of the first Moe's corporate store, which was December 8, 2000.

90.     During this initial meeting with Mr. Sprock in early 2001, Mr. Sprock notified Mr. Parker that he had a "rock star purchasing guy" who would be handling purchasing for the Moe's system. Mr. Parker assumed that meant the purchasing was being handled in-house by a Moe's employee.

91.     On September 7, 2001, Plaintiff Parde, LLC ("Parde") executed a three-store Market Development Agreement and a Franchise Agreement.

92.     Parde operated a Moe's franchise in Norcross, Georgia, which opened in 2002 or 2003.

93.     Mr. Parker and his partners subsequently formed Parde Roswell, LLC ("Parde Roswell") to operate a new Moe's franchise in Roswell, Georgia.

94.     Prior to opening the Roswell store, Parde Roswell refused to execute a franchise agreement for the Roswell store. Mr. Parker demanded a redlined franchise agreement reflecting changes from the 2001 franchise agreement by Parde, which he states he never received.

95.     Parde Roswell did not receive any UFOCs before opening the Roswell location in August 2005. The only relevant UFOC received by Mr. Parker was the initial 2001 UFOC he received in early 2001 in connection with the initial interest in joining the Moe's system.

96.     The Parde Roswell store opened in 2005 without a franchise agreement in place.

97.     Prior to filing this lawsuit in 2007, Parde Roswell received a 2007 UFOC and signed a franchise agreement for the Parde Roswell store. Mr.

Parker signed the franchise agreement on February 28, 2007 with full knowledge of the facts and circumstances relating to the CRM Commissions and Mr. Sprock's participation in SOS.

98.    On June 5, 2009, Parde, LLC, Parde Roswell, LLC and Parde Conyers, LLC sold all three of their stores to Moe's Stores, LLC for $950,000.

### D.    *Taylor Investment Partners II, LLC*

99.    On July 23, 2002, Accelerated Growth Partners, LLC ("AGP") received a 2002 UFOC.

100.    AGP is not a party to this action.

101.    On September 6, 2002, AGP executed both a 30-store Market Development Agreement and a Franchise Agreement for a location at Ansley Mall in Atlanta.

102.    On September 10, 2002, Taylor Investment Partners II, LLC ("TIP II") was formed in Georgia.

103.    At some point prior to May 15, 2003, AGP supplied TIP II with a 2002 Moe's UFOC that it had received prior to entering into a Marketing Development Agreement and the Franchise Agreement in 2002.

30

104.    Both the AGP Market Development Agreement and Franchise Agreement in connection with the Ansley Mall Moe's location were eventually assigned to TIP II on May 15, 2003 by an Assignment, Assumption and Consent Agreement between AGP (as Assignor), TIP II (as Assignee), Moe's, and Jim Garrett.

105.    The Assignment provides that AGP assigned all rights, title and interest in the Market Development Agreement and Franchise Agreement to TIP II.

106.    The Assignment further provides that Assignor (AGP) releases all claims it may have as of the date of the Assignment.

107.    Additionally, the Assignment includes an integration clause reciting that the Assignment is the entire agreement between the parties, including Moe's and TIP II. Although the Assignment does include representations, none of the representations relate to the UFOC, the contents of the Franchise Agreement, or any other statements about the Moe's supply chain by anyone from Moe's to TIP II.

108.    On March 5, 2004, TIP II executed a franchise agreement for its Decatur store.

31

109.   David Titshaw received a copy of the 2005 UFOC on or before April 29, 2005.

110.   Mr. Sprock's ownership interest in SOS was disclosed in the 2005 UFOC.

111.   Even so, TIP II continued to express an interest in obtaining the rights to open additional Moe's stores, requesting the right to open ten additional Moe's stores in January of 2007.

112.   TIP II first asserted its claims against Defendants on May 8, 2009.

### E.   Ray and Elizabeth Orgera; Barco Grills, LLC

113.   Ray Orgera received a 2001 UFOC in October or November 2002. He was aware that the UFOC he had received was outdated.

114.   Mr. Orgera also participated in a November 2002 meeting with Mr. LaGratta and Mr. Sprock during which Mr. Sprock told Mr. Orgera that Moe's did not receive any money from franchise purchases.

115.   Mr. Orgera negotiated several changes to the Moe's franchise agreement; however, none of them related to any aspect of the Moe's food supply chain management program. He did not request or receive an updated UFOC as a part of this process.

116.   On December 2, 2002, without having received the 2002 UFOC, Mr. Orgera executed a three-store Market Development Agreement and Franchise Agreement.

117.   Almost a year later, on October 14, 2003, Plaintiff Barco Grills, LLC was formed in Tennessee. Barco Grills, LLC was formed to operate the Moe's Cordova store.

118.   E-Or Store, LLC was a Tennessee limited liability company formed for the purpose of operating the Moe's Southaven store.

119.   At some point in 2005, without a franchise agreement, E-Or entered into a lease agreement for the Southaven store and proceeded with opening the store.

120.   Elizabeth Orgera signed a 2003 version of the Franchise Agreement to operate the Moe's Southaven store in early winter 2007, after the store had already opened. Ms. Orgera did not receive a UFOC before signing the Agreement.

121.   E-Or was an active limited liability company as of the date Mr. and Mrs. Orgera filed their complaint in this case.

AO 72A
(Rev.8/82)

### F.   *JSW Embry Village, LLC; JSW Cascade, LLC*

122.   Steven Walker received a 2002 UFOC on May 1, 2002.

123.   On July 3, 2002, SLW Enterprises, Inc. executed a one-store Market Development Agreement and Franchise Agreement.

124.   On July 18, 2002, JSW Embry Village, LLC was formed in Georgia. Scoven Enterprises, Inc. ("Scoven Enterprises") was incorporated on July 24, 2002. Steven Walker and Scott Walker have each owned 50% of Scoven Enterprises since its formation. Scoven Enterprises owned 100% of JSW Embry Village, LLC ("JSW Embry Village") and JSW Cascade, LLC ("JSW Cascade") at all times material to this action.

125.   The Moe's Embry Village store opened in January 2003.

126.   The Moe's Embry Village store performed well enough in 2003 to interest Steven Walker and Scott Walker in obtaining another Moe's franchise. Therefore, the Walkers caused the SLW Enterprises Inc.'s one-store Market Development Agreement to become a two-store Market Development Agreement, and changed the name of the developer to JSW Embry Village, LLC.

34

127.   On November 30, 2006, the assets of the Moe's Embry Village restaurant were sold to Pinnacle Restaurant Group, LLC for the amount of $270,000.00.

128.   The Embry Village restaurant struggled prior to the asset sale. Its annual gross sales fell consistently from the time of its opening, dropping from a high of $800,153 in 2003 to a low of $666,961 in 2006 (through the time of sale at the end of November).

129.   On November 14, 2003, JSW Cascade, LLC was formed in Georgia.

130.   On February 20, 2004, JSW Cascade executed a Franchise Agreement.

131.   Scott Walker testified that he could not recall whether he received a subsequent UFOC in connection with the Cascade store, but Steven Walker testified that he did not.

132.   In May 2004, the JSW Cascade Moe's store opened.

133.   In February 2007, the Moe's Cascade restaurant closed.

134.   Scoven Enterprises owned 100% of JSW Cascade at all times material to this action.

35

### G.   *Robert Dreesch, Steven Egan-Fowler, Brad Dunning, and Moe's Chattanooga LLC*

135.   Prior to June 2002, Plaintiff Robert Dreesch met with Martin Sprock and Daryl Dollinger and discussed the possibility of entering into a Moe's Franchise Agreement. Dreesch received a 2002 UFOC at the meeting.

136.   Dreesch understood from Mr. Sprock and Mr. Dollinger that Moe's would not make any money off of the supply chain.

137.   Plaintiffs Dreesch, Dunning, and Egan-Fowler executed a one-store Market Development Agreement and Franchise Agreement on November 18, 2002. Dreesch, Dunning, and Egan-Fowler requested an addendum to the Franchise Agreement and Moe's agreed to the addendum.

138.   Dreesch was designated as his group's Managing Member and was the only one of the three partners who had any involvement in purchasing.

139.   Moe's Chattanooga, LLC was formed in Georgia on August 14, 2003.

140.   Dreesch, Dunning, and Egan-Fowler have each owned one-third of Moe's Chattanooga, LLC since its formation.

36

141.   Moe's Chattanooga, LLC operated the Moe's Chattanooga store, but never executed a Franchise Agreement or Market Development Agreement with Moe's.

142.   The Moe's Chattanooga restaurant opened in November 2003. Subsequently, Dreesch, Dunning, and Egan-Fowler signed a second Market Development Agreement with Moe's for an additional five stores.

143.   By stipulation of the parties, Moe's Chattanooga, LLC was added as a Plaintiff in this action.

## Conclusions of Law

Pending before the Court are Plaintiffs' claims against Defendants for violation of the George Civil RICO statute, O.C.G.A. § 16-14-4, *et seq.* (Count I of the Third Amended Complaint, Dkt. [506]), Fraudulent Inducement and Fraudulent Omission (Count II), and Negligent Misrepresentation and Negligent Omission (Count III). In addition, the Tennessee Plaintiffs assert a claim against Defendants for violation of the Tennessee Consumer Protection Act, Tennessee Code §§ 47-18-101, *et seq.* (Count V). Further, Plaintiffs seek an award of punitive damages against Defendants pursuant to O.C.G.A. § 51-12-5.1(b). Finally, Plaintiffs seek an award of expenses of litigation, including

AO 72A
(Rev.8/82)

reasonable attorneys' fees, pursuant to O.C.G.A. §13-6-11. Defendants raise a number of defenses that are specific to individual defendants. Because the Court concludes that Plaintiffs cannot prevail on any of their claims, the Court does not address these specific, individual defenses. The Court now addresses each of Plaintiffs' claims, in turn.

**I.       Fraudulent Inducement and Fraudulent Omission (Count II) and Negligent Misrepresentation and Negligent Omission (Count III)**

1.       Plaintiffs base their claims of fraud and misrepresentation on (1) the representation in the UFOCs that neither Moe's nor its affiliates derive income from franchisee purchases and (2) the fact that Plaintiffs were advised by Mr. Sprock and/or others prior to entering into a Market Development Agreement or a Franchise Agreement that Moe's does not take money off of franchisee purchases ("Pre-Contractual Statements") .

2.       Georgia law requires the following elements to set forth a claim of fraud: "(1) a false representation or concealment of material fact; (2) scienter; (3) intent to induce the allegedly defrauded party to act or refrain from acting; (4) justifiable reliance; and (5) damages." <u>Young v. Oak Leaf Builders</u>, 277 Ga.

App. 274, 278, 626 S.E.2d 240 (2006). Further, fraud "does not have to be committed solely by willful misrepresentation. [Instead, it] is subtle and can be accomplished in an infinite number of ways including signs and tricks and even, in some instances, by silence." E-Z Serve Convenience Stores, Inc. v. Crowell, 244 Ga. App. 43, 46, 535 S.E.2d 16 (2000) (citations and quotations omitted).

  3. "[A] false representation made by a defendant, to be actionable, must relate to an existing fact or a past event. Fraud cannot consist of mere broken promises, unfulfilled predictions or erroneous conjecture as to future events." Next Century Commc'ns & Corp. v. Ellis, 318 F.3d 1023, 1027 (11th Cir. 2003) (quoting Fuller v. Perry, 223 Ga. App. 129, 131, 476 S.E. 2d 793 (1996)). "The general rule is that actionable fraud cannot be predicated upon promises to perform some act in the future. Nor does actionable fraud result from a mere failure to perform promises made." Equifax, Inc. v. 1600 Peachtree, LLC, 268 Ga. App. 186, 195, 601 S.E. 2d 519 (2004).

  4. "Negligent misrepresentation is a similar cause of action substituting negligence for the intent to deceive element." Prince Heaton Enter., Inc. v. Buffalo's Franchise Concepts, Inc., 117 F. Supp. 2d 1357, 1360 (N.D. Ga. 2000).

### A.    UFOC

5.    Plaintiffs contend that Defendants misrepresented in Item 8 in the

UFOC that neither Moe's nor any of its affiliates derived income from the

purchases by the franchisees. Item 8 provides:

> You must purchase certain paper products including, among other
> things, plates, cups, boxes and containers bearing the "Moe's
> Southwest Grill" name or other trade names or service marks
> through certain designated suppliers who are authorized to
> manufacture these products. You must purchase certain hardware
> and software for the operation of MOE'S SOUTHWEST GRILL
> restaurant. Those suppliers are not affiliated with us. Neither we
> nor any of our affiliates will derive any income from these
> purchases.
>
> We do not negotiate purchase agreements with suppliers for the
> benefit of franchisees. Due to the volume of purchases made from
> suppliers by the Company and its franchisees, certain suppliers
> provide discounts to the Company and its franchisees. The
> Company does not negotiate for these discounts and does not
> monitor the amount of any discounts to franchisees.

(Def.'s Tr. Ex. 1-3.)

6.    Plaintiffs assert that this provision is a false representation because

it fails to disclose the income derived by Mr. LaGratta, Mr. Sprock, and SOS,

all of whom Plaintiffs allege were "affiliates" of Moe's. The UFOC clearly

defines the purchases from which neither Moe's nor any of its affiliates will

derive any income as purchases of "certain paper products. . . certain hardware and software."

7.      The UFOC makes no representations regarding Moe's or its affiliates deriving any income from purchases by the franchisees of food.

8.      There is no evidence that Moe's or any of its affiliates derived any income from purchases by franchisees of paper products, hardware, or software.

9.      Thus, even if Mr. LaGratta, Mr. Sprock, and SOS were "affiliates" of Moe's, the UFOC makes no false representation as to the fact of their receipt of income derived from purchases by franchisees of food products.

10.      The provision regarding neither Moe's nor any of its affiliates deriving income from "these purchases" cannot be interpreted as relating to food purchases. But even if it could, the statement would be a promise as to future performance. The statement would not relate to an existing fact or a past event. Thus, even if the statement applied to food purchases, it would not be actionable.

11.      Accordingly, Plaintiffs cannot sustain a claim of fraud based upon Item 8 of the UFOC.

41

### B.       Pre-Contractual Statements

12.     Plaintiffs offered evidence that Mr. Sprock and/or others made statements before the signing of a Market Development Agreement or a Franchise Agreement that Moe's does not take money off the purchases by franchisees in the supply chain (the "Pre-Contractual Statements").

13.     The Market Development Agreements executed by Plaintiffs provide:

> 24.     ENTIRE AGREEMENT. This Agreement contains the entire agreement between the parties hereto and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, between the parties that have been relied upon by either party other than those set forth herein. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by both Developer and Franchisor.

> 25.     DEVELOPER'S ACKNOWLEDGMENTS. Developer understands and acknowledges that there are significant risks in any business venture and that the primary factor in Developer's success or failure under this Agreement will be Developer's own efforts. IN ADDITION, DEVELOPER ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO DEVELOPER OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO DEVELOPER AND THAT DEVELOPER HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR

AND DEVELOPER'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(Def.'s Tr. Ex. 28.)

14.     The Franchise Agreements executed or assumed by Plaintiffs

contained the following language:

34.     Entire Agreement. This agreement and any addendum hereto contains the entire agreement between the parties hereto relating to the operation of the restaurant at the Franchised Site and there are no representations, inducements, promises, agreements, arrangements or undertakings, oral or written, that have been relied upon by the parties other than those set forth herein. No agreement of any kind relating to the matters covered by this agreement shall be binding upon either party unless and until the same is made in writing and executed by all interested parties.

35.     Franchisee's Acknowledgments.

(a)     Franchisee assumes sole responsibility for the operation of the business Franchised hereunder and acknowledges that, while Franchisor may furnish advice and assistance to Franchisee from time to time during the term of this agreement, Franchisor has no legal or other obligation to do so except as specifically set forth herein. In addition, Franchisee acknowledges that Franchisor does not guarantee the success or profitability of the business Franchised hereunder in any manner whatsoever and shall not be liable therefor; in particular, Franchisee understands and acknowledges that the success and profitability of the business Franchised hereunder depend on many factors outside the control of either Franchisor or Franchisees (such as interest rates, unemployment rates, demographic trends and the general economic climate), but principally depend on Franchisee's efforts in the operation of the business.

43

> Franchisee understands and acknowledges that there are significant risks in any business venture and that the primary factor in Franchisee's success or failure in the business Franchised hereunder will be the Franchisee's own efforts. IN ADDITION, FRANCHISEE ACKNOWLEDGES THAT FRANCHISOR AND ITS REPRESENTATIVES HAVE MADE NO REPRESENTATIONS TO FRANCHISEE OTHER THAN OR INCONSISTENT WITH THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR PROVIDED TO FRANCHISEE, AND THAT FRANCHISEE HAS UNDERTAKEN THIS VENTURE SOLELY IN RELIANCE UPON THE MATTERS SET FORTH IN THE UNIFORM FRANCHISE OFFERING CIRCULAR AND FRANCHISEE'S OWN INDEPENDENT INVESTIGATION OF THE MERITS OF THIS VENTURE.

(Def.'s Tr. Ex. 29.)

15.     The UFOC included tables that listed important provisions of the Market Development Agreement and the Franchise Agreement that the Franchisee was cautioned to read. These tables included the integration/merger clauses quoted above and warned that only the terms of the Market Agreement and Franchise Agreement are binding and that, "Any other promises may not be enforceable." (Def.'s Tr. Ex. 1-3.)

16.     Under Georgia law, the presence of a valid and enforceable merger and integration clause may preclude a showing of the reasonable reliance necessary to establish a cause of action for fraud or negligent misrepresentation.

44

First Data POS, Inc. v. Willis, 273 Ga. 792, 795, 546 S.E.2d 781 (2001) ("As a matter of law, a valid merger clause executed by two or more parties in an arm's length transaction precludes any subsequent claim of deceit based upon pre-contractual representations.").

17.    In a case involving the same merger clauses that are at issue in the present case, this Court has held that "the merger and acknowledgment clauses contained in the Franchise Agreement preclude [plaintiff's] negligent misrepresentation claim based on the pre-contractual representations regarding food and labor costs." American Casual Dining, L.P. v. Moe's Southwest Grill, LLC, 426 F. Supp. 2d 1356, 1368 (N.D. Ga. 2006).

18.    The merger/integration clauses in the agreements at issue in this case preclude Plaintiffs' claims based on pre-contractual statements.

## II.    Georgia Civil RICO (Count I)

19.    Under the Georgia RICO Act, it is unlawful for anyone to acquire an interest in or control of money or property through a pattern of racketeering activity. O.C.G.A. § 16-14-4(a).

20.    "Any person who is injured by reason of any violation of O.C.G.A. § 16-14-4 shall have a cause of action for three times the actual damages

sustained, and where appropriate, punitive damages. Such person shall also recover attorneys' fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred." O.C.G.A. § 16-14-6(c).

21.    "To establish that defendant engaged in racketeering activity, a plaintiff must show that the defendant committed predicate offenses (set forth in O.C.G.A. § 16-14-3(9)) at least twice." <u>Maddox v. Southern Eng'g Co.</u>, 216 Ga. App. 6, 7, 453 S.E.2d 70 (1994).

22.    Theft by deception (O.C.G.A. § 16-8-3) is a predicate act under O.C.G.A. § 16-14-3(9)(A)(ix). Additionally, O.C.G.A. § 16-14-3(9)(A)(xxix) incorporates the offenses defined as "racketeering activity" in the Federal RICO statute, 18 U.S.C. § 1961(1)(A), (B), (C) and (D). Mail fraud (18 U.S.C. §1341) and wire fraud (18 U.S.C. § 1343) are two such offenses. 18 U.S.C. §1961(1)(B).

23.    Violation of the Georgia RICO statute "does not require that there be proof of an 'enterprise,' but only that the accused 'through a pattern of racketeering activity or proceeds derived therefrom, . . . acquire or maintain, directly or indirectly, any . . . real property or personal property of any nature,

46

including money.'" <u>Cobb Cnty. v. Jones Grp. P.L.C.</u>, 218 Ga. App. 149, 152-53

(1995) (quoting <u>Dover v. State</u>, 192 Ga. App. 429, 431, 385 S.E.2d 417 (1989)).

24.     A plaintiff must show that one of the predicate acts directly harmed

it. <u>Smith v. Morris, Manning & Martin, LLP.</u>, 293 Ga. App. 165-66, 666 S.E.2d

683 (2008).

25.     A corporation can be found liable, under Georgia's RICO statute,

for acts of employees and agents acting within their scope of employment and

on behalf of the corporation. <u>Cobb Cnty.</u>, 218 Ga. App. at 153.

26.     Plaintiffs contend Defendants violated the Georgia RICO Act by

acquiring an interest in and control of Plaintiffs' money through a pattern of

racketeering activity. The predicate acts alleged by Plaintiffs include theft by

deception and mail and wire fraud.

### A.     *Theft by Deception*

27.     "A person commits the offense of theft by deception when he

obtains property by any deceitful means or artful practice with the intention of

depriving the owner of the property." O.C.G.A. § 16-8-3 (a). "A person

deceives if he intentionally: (1) creates or confirms another's impression of an

existing fact or past event which is false and which the accused knows or

47

believes to be false; (2) fails to correct a false impression of an existing fact or past event which he has previously created or confirmed . . . ; or (5) promises performance of services which he does not intend to perform or knows will not be performed. Evidence of failure to perform standing alone shall not be sufficient to authorize a conviction under this subsection." O.C.G.A. § 16-8-3(b).

28.    A finding of theft by deception is "authorized only when there is a deceitful misrepresentation regarding 'an existing fact or past event,' and a false promise of future performance cannot be the basis for a conviction." Robinson v. State, 198 Ga. App. 431, 433, 401 S.E.2d 621 (1991) (citation omitted). "Creating a false impression as to a future event . . . is not sufficient." Mathis v. State, 161 Ga. App. 251,251, 288 S.E.2d 317 (1982). "The element of a false representation must bear on an existing fact or past event and not future performance." Ellerbee v. State, 256 Ga. App. 848, 853, 569 S.E.2d 902 (2002). "The reason for the rule (regarding existing or past events) is that if the party to whom the representation was made . . . chose to rely upon the promise as to a future contingency, he is not deceived by deceitful means or artful practice . . ., but his loss results from his absolute confidence in the party making the

48

promise." <u>Robinson</u>, 198 Ga. App. at 433 (citation omitted). Thus, while the

failure to perform consistently with a promise not to derive income from the

food supply chain may be a breach of that promise and therefore a basis for a

breach of contract claim, it is not theft by deception. <u>See</u> <u>Elliott v. State</u>, 149

Ga. App. 579, 581, 254 S.E.2d 900 (1979) (promise to merchants to pay in the

future for goods to be delivered in the present did not support charge of theft by

deception because "[t]hese representations pertained to the future and, even if

false and fraudulent, cannot be the basis of a prosecution for cheating and

swindling," but may be "actionable through civil process.").

29.     "[A] RICO count alleging theft by deception based upon pre-

contractual representations is foreclosed by the written terms of a valid

contractual merger clause." <u>First Data POS, Inc. v. Willis</u>, 273 Ga. 792, 546

S.E. 2d 781, 784-85 (2001)

30.     "[M]erger clauses exist in written contracts specifically to

'preclude any claim of deceit by prior representations . . . [A] person who has

received written disclosure of the truth may not claim to rely on contrary oral

falsehoods." <u>Id.</u> (quoting <u>Rissman v. Rissman</u>, 213 F.3d 381, 383 (7th Cir.

2000)

31.    The merger clauses in the Market Development Agreements and the Franchise Agreements discussed <u>supra</u> at Part I.B preclude Plaintiffs' RICO claim based on theft by deception.

### B.    Mail and Wire Fraud

32.    Plaintiffs also assert mail fraud and wire fraud as predicate acts.

33.    "Mail and wire fraud are analytically identical save for the method of execution. 'Both offenses require that a person (1) intentionally participates in a scheme or artifice to defraud another of money or property and (2) uses or 'causes' the use of the mails or wires for the purpose of executing the scheme or artifice.'" <u>United States v. Bradley</u>, 644 F.3d 1213, 1238 (11th Cir. 2011) (citation omitted).

34.    "Where mail fraud is alleged as a proximate cause of the RICO injury, the plaintiff must allege justifiable reliance.  As with their fraud claim, Plaintiffs waived any reliance on Defendants' [pre-contractual] representations in their agreement." <u>Prince Heaton</u>, 117 F. Supp. 2d at 1362 (internal citation omitted). In their Agreements, Plaintiffs waived any reliance on representations made by Defendants and agreed that they conducted an independent

50

investigation. "Therefore, they cannot show that their damages flow from the predicate acts." Id. at 1363.

35.     To the extent Plaintiffs claim fraud based on Item 8 in the UFOCs, Plaintiffs failed to establish a false representation of a material fact in the UFOCs. See discussion at Part I.A, supra. "Quite simply, where there is no fraud there is no mail [or wire] fraud." Prince Heaton,117 F. Supp. 2d at 1362. Because the fraud claims of the Plaintiffs fail, the Court also finds that the Plaintiffs have failed to establish the type of fraudulent activities that would support a finding of mail or wire fraud as a racketeering activity for Plaintiffs' RICO claims.

### III.     Violation of the Tennessee Consumer Protection Act (Count V)

36.     The Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 et seq., grants a private right of action to consumers who suffer a loss due to "unfair or deceptive acts or practices." Menuskin v. Williams, 145 F.3d 755, 767-68 (6th Cir. 1998). The Tennessee General Assembly has expressed its intent that the TCPA is to "be construed consistently with the interpretations given by the federal trade commission and

the federal courts pursuant to § 5(A)(1) of the Federal Trade Commission Act, codified in 15 U.S.C. § 45(a)(1)."  Tenn. Code Ann. § 47-18-115.

37.     Plaintiffs contend that violations of the FTC Franchise Rules, 16 C.F.R. §436.1, *et seq*., which provide that the failure of a franchisor to comply with the disclosure obligations set forth therein constitute unfair and deceptive practices, are violations of the Tennessee Consumer Protection Act.

38.     Under the FTC Franchise Rules, it is an unfair or deceptive act or practice for any franchisor or franchise broker to fail to furnish to any prospective franchisee the information specified in 16 C.F.R. §436.5 in connection with the offer or sale of any franchise. 16 C.F.R. §436.2.

39.     In the disclosure, the franchisor is required to disclose "[w]hether the franchisor or its affiliates will or may derive revenue or other material consideration from required purchases or leases by franchisees." 16 C.F.R. §436.5(h)(6).

40.     "To state a claim under the TCPA a plaintiff must show (1) the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA, and (2) the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or

52

thing of value wherever situated.'" <u>ProductiveMd, LLC v. 4UMD, LLC</u>, 821 F.Supp. 2d 955, 967 (M.D. Tenn. 2011) (citation omitted).

41.     "The scope of the TCPA is much broader than that of common law fraud. Under the TCPA, a consumer can obtain recovery without having to meet the burden of proof that is required in common-law fraud cases, and the numerous defenses that are available to the defendant in common-law fraud cases are simply not available to the defendant in a TCPA case. Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the little FTC acts, including the TCPA. Claims under the TCPA are not limited to misrepresentations that are fraudulent or willful. Instead, the TCPA applies to any act or practice that is unfair or deceptive to consumers. . . The defendant's conduct need not be willful or even knowing, but if it is, the TCPA permits the trial court to award treble damages." <u>Tucker v. Sierra Builders</u>, 180 S.W.3d 109, 115-16 (Tenn. Ct. App. 2005). A "consumer'" includes a person "who purchases or to whom is offered for sale a franchise." Tenn. Code Ann. § 47-18-103(2).

42.     However, the Tennessee Court of Appeals has held that where a merger and integration clause exists, there must be evidence of reliance on the

terms of the contract to support either a claim of fraud or a claim under the TCPA. <u>Frank Collier Auction & Realty Co. v. Rice</u>, No. 01A01-9608-CH-00384, 1997 WL 71817, at *2 (Tenn. Ct. App. Feb. 21, 1997).

43.     Thus, the presence of the merger clauses in the Market Development Agreements and the Franchise Agreements foreclose Plaintiffs' claim based on the pre-contractual statements by Mr. Sprock and/or others.

44.     However, the representations in Item 8 of the UFOCs constitute an unfair or deceptive act under the FTC regulations and thus satisfy the first element of a TCPA claim. The regulations require the franchisor to disclose "[w]hether the franchisor or its affiliates will or *may* derive revenue or other material consideration from required purchases or leases by franchisees." 16 C.F.R. §436.5(h)(6) (emphasis added). As such, the required disclosure may be a forward-looking disclosure. The franchisor need not have already derived revenue, but the receipt of such revenue must be a possibility. It must be contemplated at the time of the disclosure. When the Tennessee Plaintiffs were provided their UFOCs, Mr. Sprock and Mr. LaGratta had already discussed their business arrangement that contemplated revenues eventually flowing to Mr. Sprock, an affiliate of Moe's.  Disclosure of this arrangement was required

by the FTC regulations, and accordingly a failure to provide it was an unfair or deceptive act under the TCPA.

45.     However, in order to prevail on their TCPA claim, Plaintiffs must also show that the unfair or deceptive act caused Plaintiffs to suffer an ascertainable loss. In Part IV of the Conclusions of Law, _infra_, the Court concludes that Plaintiffs have failed to adequately prove their damages. Based on that conclusion, Plaintiffs failed to prove the second element of their TCPA claim, and the claim, therefore, fails.

## IV.   Damages

46.     The Court has found in favor of Defendants and against Plaintiffs on each of the causes of action except the TCPA claim. The Court found in Part III that though Plaintiffs could show a violation of the TCPA, they could not establish an ascertainable loss they suffered as a result of the violation. Nor are Plaintiffs entitled to recover damages under any other claims.

### A.     _Losses to Plaintiffs_

47.     Even had the Court found Defendants liable, Plaintiffs failed to adequately prove their damages.

55

48.     Plaintiffs failed to prove they suffered any loss as a result of commissions paid to CRM, SOS, Mr. LaGratta, or Mr. Sprock. The CRM Commission-based damages were not damages at all. Regardless of whether Mr. LaGratta was a contractor working with Moe's or an in-house purchaser working for a salary, he still needed CRM to obtain volume-based pricing and avoid street pricing. The CRM Commission charged by CRM in this case was its standard and customary fee for the benefit of access to CRM's Chain Links Buying Group used in purchasing negotiations. Plaintiffs failed to establish that they suffered any losses caused by the relationship between CRM, SOS, Mr. LaGratta, and Mr. Sprock. On the contrary, the evidence shows that it is more likely that the relationship resulted in net savings to Plaintiffs.

49.     Plaintiffs' evidence of "chicken damages" was not convincing. Plaintiffs' experts reached conclusions that either ignored relevant evidence or were based on unreliable evidence. The data supporting their findings were often unreliable or incomplete.

50.     Therefore, the Court concludes that Plaintiffs failed to establish that Defendants caused damages to them as a result of any of the claims asserted in this action.

56

### B.     JSW Cascade, LLC's Lost Investment

51.     Plaintiff JSW Cascade, LLC seeks damages for lost investment in operating the Moe's Cascade store.

52.     Assuming *arguendo* that the Walkers or JSW Cascade, LLC were able to establish Defendants' liability on their claim, they would not be entitled to recover for lost investment in operating the Moe's Cascade store. The relief they seek is essentially a rescission. "In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud. Critical to rescission is the tender of benefits, the prompt restoration or offer to restore whatever the complaining party received by virtue of the contract." <u>Dodds v. Dabbs, Hickman, Hill & Cannon, LLP</u>, 324 Ga. App. 337, 340, 750 S.E.2d 410 (2013). In essence, awarding "loss of investment" in this case would be tantamount to putting Plaintiffs into the position they would be in if the transaction with Moe's had never taken place. But here JSW Cascade did not promptly rescind the franchise agreement with Moe's and is therefore strictly limited to remedies consistent with its election to sue on the contract. "[T]he defrauded purchaser may seek as damages the difference in the

value of the property sold to him and its value if the property had been the same

as it was represented to be." <u>Ben Farmer Realty Co. v. Woodard</u>, 212 Ga. App.

74, 74, 441 S.E.2d 421 (1994). Plaintiffs failed to offer evidence from which

the Court could calculate such damages. Therefore, the Court concludes that

Plaintiffs failed to establish damages for lost investment in the Moe's Cascade

store.

### C.    *JSW Embry Village, LLC's Diminished Value*

53.    JSW Embry Village, LLC, seeks to recover diminished value

damages, asserting the amount they received from the sale of the Embry Village

restaurant's assets in November 2006 – more than 4 years after the franchise

was purchased – was diminished by Defendants' alleged misrepresentations.

The proper measure of damages for this claim is the difference in the value of

the franchise as purchased and the value of the franchise as represented to be at

the time of purchase, not the difference in value when sold at a later time. (<u>Id.</u>)

JSW Embry Village has provided no evidence to establish damages for

diminished value.

54.    The Court also concludes that, assuming *arguendo* JSW Embry

Village was entitled to diminished value damages, the methodology used by

Steven Walker to calculate the diminished value is unreliable. Specifically, Mr. Walker put the amount of the "IJ Markup" and "Chicken" damages back into the store's calendar year 2005 profit margins, and then used earnings before interest, taxes, depreciation, and amortization ("EBITDA") for calendar year 2005 of the Embry Village store, in order to calculate a hypothetical value of the store. He ignored the financial performance of the store throughout 2006, which was declining in comparison to 2005 numbers. Though the sale occurred near the end of 2006, he failed to show why the EBITDA should not have been based on the most recent performance of the store.

### Conclusion

The Court finds that Plaintiffs failed to prove fraud on the part of Defendants. Item 8 of the UFOC made no representation regarding the franchisor not deriving income from food purchases by the franchisees. Claims based on representations by Mr. Sprock and others before the Market Development Agreements and Franchise Agreements were signed are barred by the merger clauses in the Agreements.

The same merger clauses preclude recovery by Plaintiffs on their RICO claims based on theft by deception. The absence of a finding of fraud also

59

precludes recovery based on mail and wire fraud.

The presence of the merger clauses restricts Plaintiffs' claims under the Tennessee Consumer Protection Act to representations made in the UFOC. The Court concludes that the failure to disclose the relationship between Mr. Sprock and Mr. LaGratta was an unfair or deceptive act under TCPA. However, the Court further concludes that Plaintiffs failed to prove that the act caused Plaintiffs to suffer an ascertainable loss, and thus, the claim fails.

The Court further concludes that even if Plaintiffs had prevailed on their claims, they failed to offer sufficient evidence on which the Court could rely for the awarding of damages. The opinions of Plaintiffs' experts were speculative and lacked sufficient evidentiary support. The Court could not conclude that Plaintiffs suffered actual losses as a result of the actions of Defendants. Based on the evidence, it was more likely that Defendants actually saved Plaintiffs money through their purchasing program.

Based on the foregoing, the Court finds in favor of Defendants and hereby **ORDERS** that **JUDGMENT** be entered in favor of Defendants and against Plaintiffs.

60

**SO ORDERED**, this  3rd  day of February, 2015.


**RICHARD W. STORY**
United States District Judge

AO 72A
(Rev.8/82)